## JOSEPH MELTZER, INC., OF NEW JER-
## SEY v. UNITED STATES.
### No. 43489.

Court of Claims.
June 1, 1948.

Franklin Nevius, of New York City (Harvey D. Jacob, of Washington, D. C., Mortimer De Groot, of New York City, and Horace S. Whitman, of Washington, D. C., on the brief), for plaintiff.

Frank J. Keating, of Washington, D. C., and H. G. Morison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff made a contract on December 1, 1933, to construct for the Government Lock 21 in the Mississippi River, near Quincy, Illinois. The plaintiff sues under the general jurisdiction of the court, and, as to certain of its claims relating to labor, under the Act of July 23, 1937, 50 Stat. 533.

The first item of the plaintiff's claims relates to the collapse of its cofferdam, which entailed great additional costs and delay. As to this claim the plaintiff's po-

sition is that it encountered a subsurface and latent condition which materially differed from what was expected from the drawings and specifications and which, therefore, entitled the plaintiff to an equitable adjustment of the contract price to cover its increased costs. Article 4 of the contract, quoted in finding 9, is the basis of this claim. The plaintiff also asserts that the Government, in the drawings and writings presented to it before it made its bid, misrepresented material conditions of which the Government was aware, and thus breached its contract.

The facts with regard to the claim for the collapse of the cofferdam are, briefly, as follows: The Government, when it invited bids, gave to prospective bidders copies of the proposed contract, specifications, drawings, and other papers. A sheet marked 10/3 showing what was found by borings in the area of the work was distributed. Section 2-01 of the specifications said: "Character of Materials.—The borings indicated on Sheet 10/3 represent the character of the required excavation. It is believed that they represent the average conditions that will be encountered, and they are considered adequate to serve as a basis for planning the work and estimating the unit cost of performing the work."

The original 10/3 drawing was withdrawn and a revised drawing with the same number was substituted for it on October 24, 1933. The only change was that, as to several of the borings, the notation which had been "quicksand" on the original was changed to "fine sand". On November 14, 1933, another drawing, 10/3 A, was sent the plaintiff and other prospective bidders, showing additional data just obtained. Sheet 10/3A showed 25 borings, and as to only two of them did it show that conglomerate had been encountered. Conglomerate is a rocky substance consisting of cemented or conglomerated sand or gravel, not as hard, however, as rock. Its importance in this case is that the plaintiff says its unforeseen presence, under the cofferdam, was the cause of the collapse and the damage.

The plaintiff says that Drawing 10/3A misled it by causing it to think that the river bed in the area consisted, to such depth as was relevant, of sand, gravel and clay, since only 2 out of 25 borings showed rocky substance. It says it was further misled by the fact that it was given a document entitled "Investigation Report" which said—"Excavations and borings: Engineers have results of boring tests showing that practically all of the work will rest on sand and there is very little rock." and by the fact that the specifications called for an Ohio River box type cofferdam, although saying that another type of cofferdam might be used if the approval of the Contracting Officer was obtained.

The significance of the specification of the box type cofferdam is that all the experts seem to agree that it is not a safe type of structure to use unless it rests on a yielding substance such as sand, gravel, or clay. It is a wooden crib which is placed on the river bottom and filled with sand or gravel and banked at the sides with the same material. If there is any tendency to wash out underneath it, the yielding material on which its rests caves down and fills the incipient cavity. But if a structure like this rests on or closely above a ledge of conglomerate, with sand under it, the tendency of the high standing water outside the cofferdam to seek its level inside the pumped out area surrounded by the dam, may wet or quicken the sand under the rocky ledge and start a "piping" which will carry away a great quantity of the sand and leave a cavity under the ledge. When this cavity extends under a considerable length of the dam, the weight of the loaded dam will break through the layer of rock and a collapse of the dam will take place.

The box type cofferdam was built, and the water pumped out of the area surrounded by it. The plaintiff, in plain sight of the Government's engineers and pursuant to a plan which had been submitted to and at least tacitly approved by them, dug ditches inside the working area to conduct the water which would inevitably seep in, to several pumps from which it would be

pumped over the dam into the river, and the working area be thus kept dry.

The cofferdam had been unwatered by March 15, 1934. On April 20 a "boil" was seen in the bottom of one of the drainage ditches. A "boil" is an eruption of water like a spring, showing that water is coming, underground, from a higher level and finding an outlet at the surface of the ground. This boil was stopped by placing a large quantity of crushed stone on it. However, on April 24, another "boil" appeared, again in the bottom of a drainage ditch and within a few minutes a long section of the cofferdam collapsed and the water rushed in, scouring the river bed to a considerable depth under the place where the cofferdam had rested.

The plaintiff says the cofferdam failed because it rested on conglomerate, and a process of undermining such as is described above took place. The Government says the washout occurred because the plaintiff dug its drainage ditches too deep, thus cutting through the conglomerate which existed at the location of the ditches but which, it says, has not been proved to have underlain the cofferdam.

After the washout it was, of course, impossible to prove what had been under the cofferdam at the place of the washout. As we have said, the river bed was scoured to considerable depth, washing out everything that had been there. We think it is fairly evident that there was a rocky ledge under the cofferdam, and that the plaintiff's explanation of why the collapse occurred is correct. If, as the Government urges, there was not conglomerate under the cofferdam though it was present thirty feet inside it where the plaintiff's drainage ditch was dug, we do not see how such an extensive undermining of the cofferdam could have occurred. And the Government's contention that the plaintiff brought on its trouble by digging its drainage ditches through the layer of conglomerate inside the cofferdam seems to us to assume that, though the ledge of conglomerate did not extend under the cofferdam, it began within a few feet inside the cofferdam and was so extensive and impervious that it alone held out the whole head of water of the river until it was punctured by the plaintiff's drainage ditch. If this were a plausible hypothesis, which we think it is not, it would mean that the trouble would, in any event, have come a little later when the plaintiff excavated to place the walls of the new lock, since some of this excavation would have had to penetrate the conglomerate.

We think that a subsurface condition was encountered which, as all of the conduct of both the plaintiff and the Government's engineers shows, was not foreseen by them when they made their contract. The purpose of Article 4 of the contract relating to "changed conditions" is that the bidder should not include in his bid a sum to insure him against loss resulting form unforeseen conditions, but should rely on the Government's promise to grant him an equitable adjustment if the unforeseen occurs and harms him. We think the plaintiff was entitled to such an adjustment. The administrative procedure relating to the plaintiff's claim will now be discussed.

On April 28, 1934, four days after the collapse of the cofferdam, the Government's Resident Engineer at the site of the work made a report to the District Engineer's office as to the cause of the collapse. This report, quoted in finding 34, attributes the collapse to the existence, inferred from the known facts, of conglomerate under the cofferdam. Several months later, after the plaintiff had filed a claim for its losses resulting from the collapse of the cofferdam, a drawing which the Resident Engineer had attached to his report was revised so that it showed conglomerate only to the point where actual probing or excavation had encountered it, and hence not under the cofferdam where no probing had been done before the collapse, and where, after the collapse and consequent scouring, it had become impossible to learn, with certainty, whether there had been conglomerate or not.

In the meantime, the Chief of Engineers had, in deciding adversely the plaintiff's appeal from the Contracting Officer's decision refusing even to extend the plaintiff's time for performance, took it as proved

that the conglomerate extended under the cofferdam, but said "The information shown on the drawings is not materially different from that shown by subsequent investigation."

In response to the plaintiff's claim for an equitable adjustment of the contract price because of the unforeseen existence of the conglomerate, the Contracting Officer at first denied any relief but later, upon reconsideration, granted relief as to some costs of drainage excavation, difficulty of driving timber piles, and the necessity for driving steel sheet piles. This relief was based upon the existence of unanticipated conditions. The Contracting Officer's report, upon which this decision was based, is shown in finding 59. It says that "latent subsoil conditions at variance with those represented in the contract were observed as follows:" and then recites the presence of conglomerate in the area. The Chief of Engineers, on the plaintiff's appeal, affirmed the decision of the Contracting Officer.

The existence of unanticipated conglomerate in the area was, then, found by the Government's officials. This unforeseen condition was the cause of the collapse of the cofferdam, the necessity for changing the drainage system, the hard driving of wooden piles and the necessity for the use of steel sheet piles. As to some of these costs the plaintiff was granted an adjustment. The question arises, why were some unanticipated costs paid, and others not paid? The Chief of Engineers in his decision said—"On Item II, for unanticipated cost of cofferdam failure, I find that the information furnished to the contractor, together with the later information as to actual conditions discovered by him in the vicinity of the blow-out which occurred in the cofferdam, were sufficient to have caused him to take special precautions to guard against a blow-out, and that the failure of the cofferdam was his responsibility. I can make no allowance for this item."

The Chief of Engineers might have been referring to one or both of two events. There had been a small "boil" inside the cofferdam on April 20, four days before the collapse. This was of a kind that is not unusual inside cofferdams; was, apparently, easily cured, and was not, we think, a significant warning that the dam was unsafe. We assume, since the Chief of Engineers did not mention this fact in his decision, that he, too, regarded it as insignificant. The other fact is that the plaintiff, in digging its drainage ditches, encountered conglomerate and cut through it. This fact belied the drawings and the statements of the Government as to the nature of the river bed, and put the plaintiff on notice of the probable existence of conglomerate under the cofferdam. It likewise put the Government on notice. In addition there was excess seepage inside the cofferdam, known to the plaintiff and the Government agents. This was, perhaps, a symptom that piping through the sand under the cofferdam was taking place.

At this point, then, there was the discovery of the probability of the existence of an unforeseen condition, after the cofferdam of the type specified by the Government had been built, which type would not have been specified nor built if the parties had known before it was built what they later learned. It was, of course, too late to undo this mistake. The Chief of Engineers decided that it was the plaintiff's responsibility alone, to foresee the possible harmful consequences of the mutual mistake of itself and the Government, and to take such precautions as would avoid those consequences. But it is plain that the Government's agents did not foresee these consequences any more that the plaintiff did. We are sure that if they had foreseen them, with their possibilities of destruction of lives and property and inevitable delay in the completion of the lock, they would have warned the plaintiff, and urged or required the plaintiff to take steps to prevent those consequences. Instead, they, having misled the plaintiff into a situation which in fact was perilous, were still as unaware of the peril as was the plaintiff. In those circumstances we think that the provision of the contract as to an equitable adjustment of the costs of meeting unforeseen conditions was not eliminated from the contract, as the Chief of Engineers held that it was so far as the cofferdam failure was concerned. We think that he

and the Contracting Officer misinterpreted the contract, and did not, in fact, decide the plaintiff's claim and appeal on the basis of the contract. The plaintiff is not therefore foreclosed by their adverse decision from seeking judicial relief.

The several items of cost to the plaintiff resulting from the collapse of the cofferdam are shown in finding 74, and recovery is allowed for these amounts, which total $57,142.11.

■ We have shown in finding 54 that the plaintiff purposely flooded the cofferdam for six days from November 28 to December 4, 1934, in apprehension of a repetition of the April collapse. It asked for an extension of time on account of the delay to its work resulting from this flooding. The Contracting Officer denied the request, apparently upon the ground that the plaintiff's apprehension was unfounded. We think that the plaintiff has not proved that the peril to the cofferdam, strengthened as it was after the April collapse, was sufficiently imminent as to make this voluntary flooding a necessary consequence of the unforeseen subsurface conditions.

■ We have shown in findings 77 and 78 that, under the orders of the Government's agents who had the power to determine what the content of the concrete mix should be, the plaintiff placed 687.08 cubic yards of Class A concrete around certain ducts in the lock walls and crossovers. For this the plaintiff was paid only the price of Class B concrete, $7.75 per cubic yard. The unit price of Class A concrete was $20 per cubic yard. The additional actual cost to the plaintiff was only a fraction of the difference, $12.25, between these two prices, but we think that the contract required the Government to pay the stipulated Class A unit price. The plaintiff may recover $8,416.73 on this item.

Our findings 81 to 96 relate to the plaintiff's claim that it was not allowed to use enough water in its concrete mix to make the concrete workable and, because of the stiffness of the mix, was put to great extra expense by having to hire additional men to vibrate and spade the concrete, and by the impairment of the efficiency of its concrete distributing machines.

■ The concrete mix, including the maximum permitted water content, was stated in the specifications. It was, as plainly specified, a stiff mix, and the plaintiff should have known that it would have some difficulties in forcing this stiff concrete through the pipes of its "pumpcrete" distributing machine. The Government, having specified the mix, and not having specified the distribution system, was not obliged to alter the mix to suit the convenience and efficiency of the distribution system. And the fact that more vibrating and spading would be necessary to properly settle a stiff mix than a more fluid one, was also apparent from the specifications. Moreover, we have found that the Government permitted the plaintiff to put more water in the mix than the maximum permitted in the specifications. The fact that insistence on adherence to the specifications produced a concrete with a breaking strength considerably in excess of the minimum required by the contract is, of course, no evidence of a breach of the contract.

■ The plaintiff complains that it has been refused payment for timber used as headers to tie together the sections of cribbing for the upper and lower guide walls which sections were built separately, and later moved into position and tied together with the headers here in question. The contract drawings showed the two cribbings in place, as continuous structures, and they could, in fact, have been built that way, in which case the headers in question would not have been necessary. The plaintiff built the cribbing in sections for its own convenience and economy, and we think that it is not entitled to be paid for the extra materials made necessary and used because of its choice of that method of construction.

■ The plaintiff complains because liquidated damages for 188 days at $25 per day were assessed against it for late completion of the contract. It says that its time for performance should have been extended to cover the period for which liquidated damages were assessed. Our findings 102 to 116 relate to this question. As shown in findings 104 to 110, there was a considerable overrun in the quantities of

some items of the work, beyond the estimates of those quantities given in the invitations to bid. The only item of this overrun upon which the plaintiff preserved its rights by taking an appeal from the decision of the Contracting Officer to the Chief of Engineers was for dredging excavation in the lower approach channel. The increased yardage there called for a contract price of $82,964, or 5.65 percent of the total estimated contract price at the time the contract was made. By a formula used by the Government's agents in analogous situations in dealing with the plaintiff, an increase of 5.65 percent of the original contract time would have been given. This would have amounted to 21 days. We have found that the refusal of the Government's agents to allow the plaintiff this much of an extension was arbitrary and unreasonable. We take the same view of the refusal of any extension of time because of the collapse of the cofferdam and the consequences of that collapse. The plaintiff lost 46 days on this account. On account of these two periods of 21 days and 46 days, the plaintiff was assessed $1,675 of liquidated damages, and may recover that amount.

The facts relating to the plaintiff's labor claim are given in findings 117 to 149 and will not be repeated here. The largest item in the claim is based upon the alleged inefficiency of carpenters supplied the plaintiff by the United States Employment Service. In the contract the plaintiff agreed to obtain its labor locally, one of the purposes of the project being to relieve unemployment caused by the depression and the lack of private construction. The plaintiff had its choice, under the contract, of making the job a union job and obtaining its carpenters through the local unions of the area, or of obtaining them through the nearby offices, in Illinois and Missouri, of the Employment Service. The evidence is that the local carpenters' unions could have furnished an adequate supply of carpenters. The plaintiff, as it had a right to do, chose to obtain its labor through the Employment Service. That agency did not, of course, test a registrant to learn whether he was in fact skilled in the trade for which he registered. It referred him to a job, when one was available, and the employer had complete freedom to employ or not employ him, and, if he did employ him, to retain or discharge him. The plaintiff says that the carpenters supplied were seriously deficient in skill. We get the impression that the asserted deficiencies are, on the whole, greatly exaggerated, and that considering the unattractive nature of the 30-hour week maximum to which the plaintiff agreed in the specifications, it got as efficient a force of carpenters as it had a right to expect in the area and in the circumstances.

We do not discuss the other elements of the labor claim in detail. We think that the plaintiff has not shown any unreasonable or oppressive interpretation of the contract by the Government's agents. If there is to be a distinction between skilled and semi-skilled labor, someone must lay down the line of distinction, and it must, to be administrable, be fairly strictly adhered to. Wherever it is drawn, it is easy to urge that it should have been somewhere else. In this case the evidence shows that minor violations of the rules were sensibly ignored by the Government's agents. We think the plaintiff is not entitled to recover on any of the elements of its labor claim.

The Government concedes the plaintiff's right to recover the $786.61 awarded it by the Comptroller General but not accepted by it.

The plaintiff is entitled to recover $68,020.45.

JONES, Chief Justice, and HOWELL and LITTLETON, Judges, concur.

WHITAKER, Judge, took no part in the decision of this case.