JAMES JULIAN, INC., a corporation, Appellant,

v.

The PRESIDENT AND COMMISSION-ERS OF The TOWN OF ELKTON, a municipal corporation, Appellees.

No. 9622.

United States Court of Appeals Fourth Circuit.

Argued Nov. 20, 1964.

Decided Jan. 5, 1965.

John Van Brunt, Jr., Wilmington, Del. (Killoran & Van Brunt, Wilmington, Del., John D. Alexander and Constable, Alexander & Daneker, Baltimore, Md., on brief), for appellant.

Joseph. M. Roulhac, Baltimore, Md. (Richard W. Case and Smith, Somerville & Case, Baltimore, Md., on brief), for appellees.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge:

The plaintiff corporation, a contractor, brought this suit against the Town of Elkton, Maryland, to recover among other items the agreed costs for certain "extras" performed by it in the process of laying a sewer line for the town. Only the compensation sought for the alleged "extra work," however, is involved in this appeal.

The plaintiff claimed under a provision of the contract which committed the defendant to payments in addition to the contract price if the "contractor encounter[ed] * * * subsurface * * * conditions * * * or unknown conditions of an unusual nature differing materially from those ordinarily encoun-

tered * * * in work of the character provided for in the drawings and specifications * * *." [1] The town's primary defense was that the conditions were not unusual. In the alternative, the town contended that even if they were unusual, the contractor was negligent in failing to conduct a proper pre-bid inspection of the site. In this alternative defense, the town relied upon the usual exculpatory clauses contained in public contracts: paragraph 7 required the contractor to visit the site and to examine carefully the size and locality of the work contemplated, paragraph 19 permitted preliminary subsurface exploration at the bidder's expense, and paragraph 39(d) required the contractor to warrant that he had examined the site and satisfied himself as to the nature and location of the work and the quality and character of the subsurface material likely to be encountered. Other paragraphs exonerated the town for insufficiency or error in the information furnished bidders.

The plaintiff's general superintendent testified that before submitting its bid, his firm sent a crew consisting of an experienced foreman and three men to the job site to walk the line which the town had laid off for the sewer, to observe anything unusual, and to take test borings at the various manhole sites along the line and at any other places they deemed necessary to determine the subsurface conditions. The plaintiff's general superintendent and its president testified that their corporation had laid "hundreds of miles" of sewer line under similar conditions and that this was their usual and customary practice. The crew foreman testified that he and his crew spent sev-

eral days performing their work as directed—they walked the sewer right-of-way and saw nothing unusual, and they took borings near the site of each proposed sewer manhole. Between manholes 2 and 6, the area involved in this controversy, these borings disclosed that at from 5 to 7 feet the solid surface gave way to wet and sandy material in which their hand augers would not operate. This information was reported to company officials who concluded from the corings thus obtained that no unusual geological formations should be anticipated. After taking into consideration the existence of the wet and sandy subsurface material which they concluded would require procedures for draining subsurface water, they prepared and submitted the Julian bid. This bid was the lowest one received, and the plaintiff was awarded the contract.

In the process of constructing the sewer, the line of which roughly paralleled the banks of the Elk River, the plaintiff encountered no difficulty until a point approximately 15 feet upstream from manhole 3 was reached. At this point, where the bottom of the trench was to be between 16 and 20 feet below the surface, it was impossible to insert well points [2] below 5 or 6 feet. Attempts to locate the trouble by excavation along and adjacent to the trench line disclosed what appeared to be parts of an old wharf or pier which had, over a long period of time, been covered over by natural or man-made fill to a depth of 5 or 6 feet. This structure consisted of horizontal planking and heavy supporting timbers which extended from the river bank toward the trench line for a distance of be-

---

1. Paragraph 24(d) of the contract read:

"Should the Contractor encounter, or the Owner discover, during the progress of the work subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the attention of the Owner shall be called immediately to such conditions before they are disturbed. The Owner shall thereupon promptly investigate the conditions, and if it finds that they do so materially differ, the contract shall, with the written approval of the Owner, be modified to provide for any increase or decrease of cost or difference in time resulting from such conditions."

2. Well points are pipes inserted in the ground through which the subsurface water is extracted.

tween 20 and 30 feet. The structure was connected by one-inch steel rods to a concrete deadman. The deadman was a concrete slab which had a thickness of about 10 inches and was of undisclosed depth. It lay roughly parallel to the trench line on the opposite side from the river.[3] Opposite this deadman, along the bank of the Elk River, the tops of old and rotted pilings were visible. At low tide, some horizontal planking could be seen protruding from the embankment. The court found that anyone who walked the bank of the river should have been put on notice that some sort of bulkhead or pier had at one time existed there but that its direction or width would not necessarily have been apparent. At the point where the horizontal planking was visible, the sewer right-of-way was from 20 to 30 feet from the river bank. The difficulties encountered in the construction of the line covered a distance of approximately 450 feet lying between manholes 3 and 5. The contractor reported his inability to drain the ditch by normal methods to the firm serving as the town's consulting engineer, and it suggested a process known as sheeting and shoring to correct the difficulty. The

Julian representatives at the site, however, insisted that it was not possible to use this method, and they decided instead to excavate and remove the foreign material which was causing the ditch to flood from the river. Since the firm acting as the town's consulting engineer did not consider the condition unusual and did not contemplate extra payments for correcting it, there was no insistence that its prior suggestion be complied with. Once the obstructions were removed, no further difficulty in laying the sewer line at this point was experienced. It is this removal work for which the plaintiff has claimed the extra compensation.

The trial court found

"that these conditions were 'unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for' in the contract, within the language of paragraph 24(d). However the Court further finds that a reasonable pre-bid inspection, both as a matter of common prudence, and under the specific requirements of para-

---

3. With the consent of counsel, the district judge visited the site during the trial, which occurred three years after the contract was entered into. The judge noted that at the time of his visit the grade averages directly over the sewer line were two feet lower between manholes 3 and 4 and one foot lower between manholes 4 and 5 than the elevations shown on the first project blueprint, indicating that the grades had changed since construction. The district judge described the deadman as follows:

"It is a concrete slab about ten inches in width for the first sixteen feet and is presently out of the ground a distance of two to eight inches (ten feet North of the center line of the pipe line). There is about a two and one-half feet break; then the slab is barely visible for about three and one-half feet; then there is an intermediate thirty-seven feet, where some few concrete chips may be seen along the projection of the slab but no solid structure is found. Next there is about a six foot stretch of slab with a break

of three feet, then seven feet more, and an iron bent in a form of a hook or an eye appears six inches from the concrete about three feet from Ben's Gut. Further along there is a rod projecting about ten inches which is three feet from the concrete.

"The concrete either terminates, or at the end of the visible concrete, there are two blocks forming a triangular structure, one being about two feet square, and the other about two feet wide by four feet long, and adjacent to this is a metal rod which projects some three feet or more at an angle. About 25 feet East of these blocks and about three feet North of the line of the concrete slab, there are three sides of a six inch concrete foundation, and, apparently, the missing side has been moved and has been deposited on or pushed onto the shore of the creek. There is some indication of the possible continuance of the concrete in the same direction for a distance of 30 feet or more from the concrete foundation."

graphs 7, 19, 39(d) and 3–23, previously quoted, would have made known the existence of 'conditions of an unusual nature'."

The court further declared that

"The Court finds as a fact, and concludes as a matter of law, that Julian was negligent in its examination of the job site and in testing for subsurface conditions; that this negligence was the proximate cause of Julian's failure to discover the existence of 'unusual conditions' between manholes 3 and 5; and that Julian is not entitled to recover for 'extra work'."

The substance of the evidence offered by the plaintiff concerning the pre-bid site inspection has already been stated. The only evidence offered by the town on this point came from the testimony of Mr. Bartles, who was employed by the firm serving as the town's consulting engineer for this job, and Mr. Crothers, the town's resident engineer. The thrust of Mr. Bartles' testimony was not that there had been any inadequacy in the contractor's pre-bid investigation; rather, it was to the effect that the conditions encountered, i. e., the flooding from the river caused by the existence of and necessitating the removal of the underground structure, was not an unusual condition within the meaning of para-

graph 24(d) of the contract, an argument, it might be pointed out, which was rejected by the district judge.

Bartles also testified that he went to the job site and walked the proposed sewer line before bids were returned and that he noticed nothing which caused him to suspect that any unusual conditions existed, even though he observed both the concrete deadman and the pilings along the river, which he examined out of curiosity but not because it occurred to him that they might be connected in some way with some structure which might extend inland far enough to affect the laying of the sewer line. He stated further that at that time he did not believe the deadman would hinder or obstruct the construction work because what he observed was outside the proposed trench area at all points.

Only Mr. Crothers, the town's resident engineer, testified that he attached any significance to the existence of the riverside pilings, and he conceded on cross-examination that this probably was because he was familiar with the property, since it had at one time been owned by his brother and since he had lived in Elkton for a number of years and was therefore familiar with many past local occurrences.[4] He stated further that it was common knowledge in the community that a pulp mill with a loading dock had

4. Initially, Crothers testified that he agreed in substance with the testimony of Mr. Bartles, which was to the effect that the pilings and deadman did not indicate to him that any unusual structures should be anticipated in excavating the trench. Later, in answering a question by the court, Crothers qualified his original position somewhat with the following testimony:

"I can agree with Mr. Bartles' statement as to what he saw.

"Now, as to the conclusion he came to, as to whether it would be a construction problem, if he said that he did not feel that it would be, I don't know whether I would go along with that or not.

"Certainly, if I were looking that job over, from what I saw on the surface, I would make a thorough examination of the subsoil conditions to determine

what was under there, in view of what I could see on the surface, and that would be a number of tests, to be sure. "(The Court) But I did correctly understand you, did I not, that when you were asked whether it occurred to you, as to whether there might be a different condition encountered between [manholes] 3 and 5, from other parts of the line, and that it might seriously hamper the contractor's work, you did have such an idea or impression?

"(The Witness) In my opinion, definitely, there was a difference between manholes 3 and 5.

"(The Court) Was that based upon *both* what you saw and what you knew?

"(The Witness) Yes, sir. * * * *From what I know,* I would have made extensive tests and observations at this point." (Emphasis supplied.)

once existed near the spot where the pilings could be observed and that he in past years had seen boats loaded with wood standing at this pier. He testified that he walked the site before the bids for the sewer project were received and saw the pilings as well as the deadman, which he remembered as being about level with the surface of the ground at that time. However, he did not discuss the possible subsurface conditions in that area with any person associated with the Regester Company, the engineering firm in charge of the project plans, or suggest to anyone that the existence of these structures should be noted on the project drawings.

Thus the record discloses that the plaintiff made its customary pre-bid inspection and that such an inspection revealed nothing which put it on notice of an unusual condition. It further discloses that the town, which was defending primarily on the ground that the plaintiff's pre-bid inspection was negligent, offered no substantial evidence to show that the plaintiff acted unreasonably under the circumstances. Indeed, only Crothers' testimony could possibly be construed to support such a position, and all he said was that in view *both* of what he observed and *what he knew from living in the area for many years,* he would have done more extensive pre-bid subsurface testing had he been a contractor bidding on this contract.

The plaintiff's borings were adequate to disclose the subsurface geological conditions, which was the primary purpose for which they were made. The fact that the number of borings sufficient to disclose adequately these subsurface geological conditions was not also sufficient to disclose the artificial barrier which lay under a small portion of the trench area does not in itself impute negligence to the plaintiff. The relevant inquiry is whether the plaintiff acted reasonably under the circumstances existing when his conduct occurred.

We think this record, considered as a whole, contains no substantial evidence to support a finding that the pre-bid examination of the plaintiff was careless or negligent or that it was below the standard prevalent in the industry. We cannot escape the impression that the district judge's view of the premises during the trial was ineluctably influenced both by hindsight and by the altered conditions which then existed.

The provisions of paragraph 24 (d) should be given equal weight with other provisions in the contract. Since the "changed conditions" clause in this contract is similar to those frequently found in contracts with the federal government, decisions interpreting those clauses are relevant to the present inquiry. As the Court of Claims, the judicial body to whom this problem of interpretation is most often presented, has observed, the primary reason for including a "changed conditions" provision in a government contract is to encourage lower bids but bidding with the understanding that an adjustment in the contract price will be made where the circumstances so warrant. Joseph Meltzer, Inc. v. United States, 77 F.Supp. 1018, 1020, 111 Ct.Cl. 389 (1948). If all considerations of equity and justice are disregarded in interpreting these relief clauses, then a contract to do a useful job for a governmental unit is turned into a gambling transaction. Cf. Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957); General Cas. Co. v. United States, 127 F. Supp. 805, 809, 812, 130 Ct.Cl. 520, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L. Ed. 1266 (1955); Loftis v. United States, 76 F.Supp. 816, 825–827 (1948); Peter Kiewit Sons' Co. v. United States, 74 F. Supp. 165, 168, 109 Ct.Cl. 517 (1947); see also Annotation, 85 A.L.R.2d 211 (1962). We think the principle stated above is a sound one, and we apply it here.

From our examination of the record as a whole, we are left with the definite and firm conviction that a mistake has been committed. We think the finding that plaintiff failed to make a reasonable pre-bid examination is clearly

erroneous, and the judgment below must therefore be reversed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Smith v. United States, 336 F.2d 165, 168 (4 Cir. 1964); Sanders v. Leech, 158 F. 2d 486, 487 (5 Cir. 1946); 2B BARRON & HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 1135 (Wright ed. 1961).

The case is remanded to the district court with instructions to amend its judgment to award the plaintiff the additional agreed amount.

Reversed and remanded.