353 F.2d 1018
 SCHUTT CONSTRUCTION COMPANY, INC., GENOA, WISCONSIN, for itself and on Behalf of Its Subcontractor Yellow Pine Lumber Company, Chipley, Florida, and Said Subcontractor's Successor, Tri-States Contracting Company, Inc.,* Chipley, Florida,
v.
The UNITED STATES.
 Cong. No. 3-59.
 United States Court of Claims.
 December 17, 1965.
 
 Warren Magee, Washington, D. C., for plaintiff; Hans A. Nathan, Washington, D. C., attorney of record; Millard F. Caldwell, Tallahassee, Fla., of counsel.
 Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.
 Before COWEN, Chief Judge, LARAMORE, DURFEE and COLLINS, Judges, and JONES, Senior Judge.
 JONES, Senior Judge.
 
 
 1
 The primary issue in this case is whether, under the facts here involved, an excavating contractor is equitably entitled to reimbursement for a 15 percent overrun in the amount of trees and brush cleared under a lump-sum contract.[1]
 
 
 2
 On June 1, 1953, the Army Corps of Engineers solicited lump-sum bids for clearing all the trees and brush along a 20-mile stretch of the Cumberland River near Nashville, Tennessee. The bid specifications stated that there were approximately 10,480 acres involved, but that only approximately 2,828 acres were actually wooded; the rest being farm land. The specifications further stated that the approximations had been taken from aerial photographs, and the contractor would be required to clear all the trees and brush encountered, whether greater than 2,828 acres or not.
 
 
 3
 Since the 30-day period allowed for bidding admittedly was not sufficient to permit intelligent on-site estimates of the wooded acreage involved, bidders had no choice but to rely on the "2,828-acre estimate" furnished by the Corps of Engineers. The Army had derived its estimate from photographs rather than an actual survey because of the costs involved. As a result the estimate turned out to be off by 1,095 wooded acres — an overrun of 39 percent.
 
 
 4
 The Schutt Construction Company was the low bidder with a lump-sum bid of $565,946.85. Based on the 2,828-acre estimate this bid was about $200 per wooded acre. Other bids ranged from $642,455 to $972,000. The Government estimate, exclusive of profit, was $885,000. Schutt signed the contract on July 16, 1953, and then subcontracted the entire job to Yellow Pine Lumber Company for $509,352. Yellow Pine had been second lowest bidder on the original Government contract at $642,455 and so accepted this subcontract at a price $133,103 less than its original cost estimate.
 
 
 5
 Yellow Pine commenced clearing operations in August 1953. The contract called for clearing the area below elevation 420 within 130 days and the entire area within 300 days. The subcontractor elected to clear the entire area in one operation rather than first clearing the entire project at the lower elevation and then returning to the higher elevation. This resulted in a delayed completion at the lower level and an assessment of liquidated damages at $50 per day.
 
 
 6
 On December 27, 1953, the Yellow Pine partnership was succeeded as subcontractor by the Tri-States Construction Company. The managerial personnel remained the same, however, and clearing work continued uninterrupted. Tri-States completed the project on July 3, 1954 — 26 days late. Liquidated damages were assessed in the amount of $9,900 for both the over-all delay and the delay in completing clearing of the lower level. The performance of the subcontractor was satisfactory.
 
 
 7
 During the clearing operations both the subcontractor and the Government inspector concluded that there were substantially more than 2,828 wooded acres. After completion, the subcontractor surveyed the area and determined that there actually had been 3,923 wooded acres cleared. This was an overrun of 1,095 acres — 39 percent. Tri-States (the subcontractor) then filed a claim with the contracting officer via Schutt (the prime contractor) for $200 per acre on the extra 1,095 acres cleared. Return of the liquidated damages was also sought.
 
 
 8
 The contracting officer disallowed the entire claim on the ground that the overrun did not constitute a "changed condition" under Article 4 of the contract. This article calls for an adjustment in the price if the conditions actually encountered differ materially from those ordinarily found under such a contract.
 
 
 9
 The decision of the contracting officer was appealed to the Corps of Engineers Claims and Appeals Board. The appeal was at first denied but on rehearing the Board reversed its previous decision and ruled that a "changed condition" did exist. However, the Board did not find that the plaintiff was entitled to recover costs for the entire 1,095-acre overrun. It concluded that the use of "approximate" in the bid specifications to modify "2,828 acres" obligated the plaintiff to clear a 15 percent overrun under the lump-sum price. Any overrun exceeding 15 percent was considered a material change and recovery was allowed. This amounted to $134,200 — $200 per acre on 671 acres. The subcontractor is presently seeking recovery on the remaining 15 percent — 424 acres.
 
 
 10
 Since the plaintiff had not shown that any of the 1,095-acre overrun was encountered below elevation 420, the Board only allowed an extension of time for completion of the over-all project. This resulted in a remission of $1,200 of the liquidated damages. The $8,700 assessed for the delay in clearing below level 420 was not returned to the plaintiff. The Board also denied recovery of the survey expenses.
 
 
 11
 Schutt was paid a total of $135,400 as a result of the Board's decision. Five percent of this sum was retained by Schutt and the remainder, except for attorneys' fees, was divided between the subcontractor (Tri-States) and the bonding company. Upon receipt of its share, Tri-States executed a general release of Schutt from any further liability on the contract. The release was dated March 12, 1958.
 
 
 12
 On February 2, 1959, a bill was introduced in the House of Representatives for payment to Schutt, "for itself and on behalf of its subcontractors," the sum of $142,694.64. This consists of payment of $200 per acre for the 15 percent overrun, survey costs, attorneys' fees, other miscellaneous expenses and return of the liquidated damages. On June 23, 1959, the bill was referred to this court for a determination of whether there is any legal or equitable ground upon which to base this claim.
 
 
 13
 Counsel for the appellant admitted during oral argument that his theory of recovery rests solely in equity. The general release given Schutt by Tri-States after the recovery from the Appeals Board relieved the prime contractor from any further liability. And since the prime contractor has suffered no damages itself, and is no longer liable to the subcontractor for its losses, there is no legal ground for a claim against the Government. Privity exists only between the Government and the prime contractor. Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944). Furthermore, there are present no special circumstances such as fraud, duress, or mutual mistake as to the meaning of the release, which would allow the prosecution of the legal claim despite the release. E. g., Winn-Senter Construction Co. v. United States 75 F.Supp. 255, 110 Ct.Cl. 34 (1948); Nippon Hodo Company, Ltd. v. United States, 160 F.Supp. 501, 142 Ct.Cl. 1 (1958).
 
 
 14
 The sole question presented then is whether, under the broad equity jurisdiction granted this court in congressional reference cases, the Government should in good conscience reimburse the subcontractor for any or all of its losses. Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658 (1949). In this context we do not feel that the release between the subcontractor and the prime contractor, standing by itself, should work as a total bar to any possible recovery.[2]
 
 
 15
 The legal conclusion of the Appeals Board that a 39 percent overrun, in the facts and circumstances of this case, was a material change and warranted a price adjustment, is supported by numerous decisions in this court. E. g., Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 109 Ct.Cl. 517, (1947); Chernus v. United States, 75 F.Supp. 1018, 110 Ct.Cl. 264 (1948); Loftis v. United States, 76 F.Supp. 816, 110 Ct.Cl. 551 (1948); Joseph Meltzer, Inc. v. United States, 77 F.Supp. 1018, 111 Ct.Cl. 389 (1948), and Fehlhaber Corporation v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, cert. denied 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). To do otherwise, and hold the contractor to its original lump-sum bid, would negate one of the prime reasons for incorporating a "changed condition" article into these contracts, i. e., "to induce bidders not to increase their prices to cover possible misfortunes which might result from unforeseen developments." Chernus v. United States, supra, 75 F.Supp. at 1019, 110 Ct.Cl. at 267. This is true even though the Army attempted to protect itself by inserting caveatory and exculpatory provisions in the contract. The plaintiff had no opportunity to properly investigate and so had a right to rely on the Government's estimate. Fehlhaber Corporation v. United States, supra.
 
 
 16
 However, the further conclusion of the Board that recovery should be limited to the excess acreage over 15 percent is not based on any strong legal ground. No previous case in the court has dealt specifically with this question. Normally if the plaintiff proves a material change in these construction cases, the court allows recovery for the entire change.[3] Apparently the Government has never before contended that recovery should be limited to the excess above a set "reasonably foreseeable overrun." None of these cases, however, have been lump-sum contracts for the clearing of land.
 
 
 17
 Whether this ruling of the Appeals Board limiting the plaintiff's recovery to the excess over 15 percent was correct at law, we need not decide. As previously stated, the general release executed by Tri-States abrogated whatever claim at law there was against the Government for payment of the 15 percent. However, in determining whether the subcontractor has an equitable claim as defined by this court in congressional reference cases it is not necessary for us to first determine if the Board was correct at law. Rather, we look solely to see if the subcontractor, in the facts and circumstances here involved, was unfairly dealt with by the Government.
 
 
 18
 From the testimony before the Appeals Board and the trial commissioner, it is evident that not only was 30 days insufficient for investigating this large and oddly contoured tract of land, but also that bidders cannot financially afford to survey every large project prior to bidding on it. When time does allow, the bidder normally visits the site and through detailed observation arrives at an accurate estimate of the work involved. In the case before us, however, accurate estimates were not possible within the time allotted. The Government, therefore, furnished approximations of the wooded acreage involved. These estimates were to be used in preparing bids, yet the Government stated it would not guarantee the estimates. The successful bidder was to be held responsible for clearing whatever trees and brush were actually encountered. The bidders thus faced an unusual risk.
 
 
 19
 The Government now concedes that there was a mutual mistake of fact and that the estimate furnished by the Corps of Engineers was off by 39 percent in favor of the Government. It further concedes that the bidders cannot be held to have inflated their cost estimates to cover this 39 percent overrun. Yet the Government does feel that the bidders should have blown up their prices to guard against a 15 percent error in the Army's figures. Is this equitable?
 
 
 20
 The evidence presented is inconclusive on whether, in the clearing industry, bidders expect reimbursement for overruns. Certainly the evidence indicates that, when the contract states the precise acreage without qualifying language, any overrun will be paid for regardless of its amount.[4] But, of course, this is not the situation present here.
 
 
 21
 The Appeals Board found, and we agree, that a bid of $200 per wooded acre was adequate for clearing 2,828 wooded acres plus random trees, brush, and fences. The actual cost incurred by the subcontractor, without profit, in clearing the entire 3,923 wooded acres was about $190 per acre. If the Government's estimate had been accurate, the subcontractor would have not lost any money.
 
 
 22
 It may be contended that the plaintiff should have expected some overrun. The bid specifications did state that the "2,828 acres" was approximate and the contractor would be obligated to clear all trees and brush actually encountered. But at a cost of $200 per acre, an overrun of 15 percent amounts to $84,800. This appears to be quite a financial burder to place upon a contractor, especially when the bidders had no choice but to rely on the Government's estimate; there being insufficient time for individual estimates.
 
 
 23
 In addition, the Government should have disclosed to the plaintiff that the aerial photographs from which the Army estimated the wooded acreage were 3 years old. A professional forester testified that in 3 years' time new trees could have grown to a height of 12 to 16 feet and to a diameter of 2 inches. The age of the photographs could therefore have been very helpful to the plaintiff in preparing its cost estimate.
 
 
 24
 In conclusion, the Government witnesses testified that aerial photographs are used rather than on-site surveys in preparing work estimates because of the cost involved. This is so even though it results in inaccurate estimates; accuracy being only obtainable from the ground. Yet in this instance the Corps of Engineers did not even use up-to-date photographs, nor did it allow time for bidders to check the accuracy of the estimate. In addition, the word "approximate" was used in an attempt to place all the risk of using the estimate upon the bidder. The witnesses for the Government could not say whether this use of "approximate" on Invitations for Bids was a common practice by the Corps of Engineers or not.
 
 
 25
 In these circumstances we feel that the expenses involved in clearing the 15 percent overrun should be shared by the Government and the subcontractor. There is something to be said on either side. The Government received the full benefit of the work performed; a clearing job which the Government inspector considered very satisfactory. This amounted to 424 acres at a cost of $84,800 to the subcontractor. On the other hand, the "2,828" figure was an estimate and there was no guarantee that an overrun would not occur. The plaintiff could have reasonably anticipated some excess acreage. Apparently there was a mutual mistake of fact. Neither party expected a 39 percent overrun. The Government made no attempt to check the accuracy of its estimate and did not allow plaintiff sufficient time to do so.
 
 
 26
 When all the facts are considered we think that, even with some tolerance for a reasonable overrun, there is full justification under our congressional reference jurisdiction for allowing an equal division of this excess cost of clearing 424 acres. We therefore recommend to the Congress that it pay the subcontractor, Tri-States Construction Company, Inc., $42,400. In the circumstances, we do not find that the subcontractor should be compensated for any of the other claims: liquidated damages, counsel fees, etc.[5]
 
 
 27
 Since the prime contractor, Schutt Construction Company, has suffered no damages as a result of this Government contract, we find that it is not entitled to share in the recovery.
 
 
 
 Notes:
 
 
 *
 The correct name is Tri-States Construction Company, Inc
 
 
 [1]
 Since the petition in this case was filed and substantial evidence taken prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), we think it proper to file this report without reference to the Supreme Court's opinions in that case. Consequently, defendant's suggestion of lack of jurisdiction to entertain congressional references is rejected
 
 
 [2]
 In Hellander v. United States, 178 F. Supp. 932, 147 Ct.Cl. 550 (1959), where a general release was involved, this court denied an equitable recovery. However, the claim was primarily denied because it was without merit and because the plaintiff had not attempted to pursue his administrative remedies
 
 
 [3]
 In Loftis v. United States, supra, the plaintiff recovered at an increased unit price for all the unforeseen excavation; in Joseph Meltzer, Inc. v. United States, supra, the entire cost of constructing a new cofferdam was recovered where its initial collapse was caused by unforeseen conditions; in Fehlhaber Corporation v. United States, supra, 151 F.Supp. at 825. 138 Ct.Cl. at 585, we stated, "Plaintiff should, therefore, be reimbursed to the extent that the changed conditions caused it to incur expenditures in excess of that which would have been incurred had the subsurface been as reported by the specifications." In Peter Kiewit Sons' Co. v. United States, supra, and Chernus v. United States, supra, the court did not reach the issue of the amount of recovery
 
 
 [4]
 See Finding of Fact 18
 
 
 [5]
 See Findings of Fact 17 to 24