Jones, Senior Judge,
delivered the opinion of the court:
The primary issue in this case is whether, under the facts here involved, an excavating contractor is equitably entitled to reimbursement for a 15 percent overrun in the amount of trees and brush cleared under a lump-sum contract.[1]
On June 1, 1953, the Army Corps of Engineers solicited lump-sum bids for clearing all the trees and brush along a 20-mile stretch of the Cumberland River near Nashville, Tennessee. The bid specifications stated that there were approximately 10,480 acres involved, but that only approximately 2,828 acres were actually wooded; the rest being farm land. The specifications further stated that the approximations had been taken from aerial photographs, and the contractor would be required to clear all the trees and brush encountered, whether greater than 2,828 acres or not.
Since the 30-day period allowed for bidding admittedly was not sufficient to permit intelligent on-site estimates of the wooded acreage involved, bidders had no choice but to rely on the “2,828-acre estimate” furnished by the Corps of Engineers. The Army had derived its estimate from photographs rather than an actual survey because of the costs involved. As a result the estimate turned out to be off by 1,095 wooded acres — an overrun of 39 percent.
The Schutt Construction Company was the low bidder with a lump-sum bid of $565,946.85. Based on the 2,828-acre estimate this bid was about $200 per wooded acre. Other bids ranged from $642,455 to $972,000. The Govern *839 ment estimate, exclusive of profit, was $885,000. Schutt signed the contract on July 16, 1953, and then subcontracted the entire job to Yellow Pine Lumber Company for $509,352. Yellow Pine had been second lowest bidder on the original Government contract at $642,455 and so accepted this subcontract at a price $133,103 less than its original cost estimate.
Yellow Pine commenced clearing operations in August 1953. The contract called for clearing the area below elevation 420 within 130 days and the entire area within 300 days. The subcontractor elected to clear the entire area in one operation rather than first clearing the entire project at the lower elevation and then returning to the higher elevation. This resulted in a delayed completion at the lower level and an assessment of liquidated damages at $50 per day.
On December 27, 1953, the Yellow Pine partnership was succeeded as subcontractor by the Tri-States Construction Company. The managerial personnel remained the same, however, and clearing work continued uninterrupted. TriStates completed the project on July 3, 1954 — 26 days late. Liquidated damages were assessed in the amount of $9,900 for both the over-all delay and the delay in completing clearing of the lower level. The performance of the subcontractor was satisfactory.
During the clearing operations both the subcontractor and the Government inspector concluded that there were substantially more than 2,828 wooded acres. After completion, the subcontractor surveyed the area and determined that there actually had been 3,923 wooded acres cleared. This was an overrun of 1,095 acres — 39 percent. Tri-States (the subcontractor) then filed a claim with the contracting officer via Schutt (the prime contractor) for $200 per acre on the .extra 1,095 acres cleared. Return of the liquidated damages was also sought.
The contracting officer disallowed the entire claim on the ground that the overrun did not constitute a “changed condition” under Article 4 of the contract. This article calls for an adjustment in the price if the conditions actually encountered differ materially from those ordinarily found under such a contract.
*840 The decision of the contracting officer was appealed to the Corps of Engineers Claims and Appeals Board. The appeal was at first denied but on rehearing the Board reversed its previous decision and ruled that a “changed condition” did exist. However, the Board did not find that the plaintiff was entitled to recover costs for the entire 1,095-acre overrun. It concluded that the use of “approximate” in the bid specifications to modify “2,828 acres” obligated the plaintiff to clear a 15 percent overrun under the lump-sum price. Any overrun exceeding 15 percent was considered a material change and recovery was allowed. This amounted to $134,200 — $200 per acre on 671 acres. The subcontractor is presently seeking recovery on the remaining 15 percent — • 424 acres.
Since the plaintiff had not shown that any of the 1,095-acre overrun was encountered below elevation 420, the Board only allowed an extension of time for completion of the overall project. This resulted in a remission of $1,200 of the liquidated damages. The $8,700 assessed for the delay in clearing below level 420 was not returned to the plaintiff. The Board also denied recovery of the survey expenses.
Schutt was paid a total of $135,400 as a result of the Board’s decision. Five percent of this sum was retained by Schutt and the remainder, except for attorneys’ fees, was divided between the subcontractor (Tri-States) and the bonding company. Upon receipt of its share, Tri-States executed a general release of Schutt from any further liability on the contract. The release was dated March 12,1958.
On February 2, 1959, a bill was introduced in the House of Representatives for payment to Schutt, “for itself and on behalf of its subcontractors,” the sum of $142,694.64. This consists of payment of $200 per acre for the 15 percent overrun, survey costs, attorneys’ fees, other miscellaneous expenses and return of the liquidated damages. On June 23, 1959, the bill was referred to this court for a determination of whether there is any legal or equitable ground upon which to base this claim.
Counsel for the appellant admitted during oral argument that his theory of recovery rests solely in equity. . The general release given Schutt by Tri-States after the recovery *841 from the Appeals Board relieved the prime contractor from any further liability. And since the prime contractor has suffered no damages itself, and is no longer liable to the subcontractor for its losses, there is no legal ground for a claim against the Government. Privity exists only between the Government and the prime contractor. Severin v. United States, 99 Ct. Cl. 435 (1943), cert. denied, 322 U.S. 733 (1944). Furthermore, there are present no special circumstances such as fraud, duress, or mutual mistake as to the meaning of the release, which would allow the prosecution of the legal claim despite the release. E.g., Winn-Senter Construction Co. v. United States, 110 Ct. Cl. 34, 75 F. Supp. 255 (1948); Nippon Hodō Company, Ltd. v. United States, 142 Ct. Cl. 1, 160 F. Supp. 501 (1958).
The sole question presented then is whether, under the broad equity jurisdiction granted this court in congressional reference cases, the Government should in good conscience reimburse the subcontractor for any or all of its losses. Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949). In this context we do not feel that the release between the subcontractor and the prime contractor, standing by itself, should work as a total bar to any possible recovery.[2]
The legal conclusion of the Appeals Board that a 39 percent overrun, in the facts and circumstances of this case, was a material change and warranted a price adjustment, is supported by numerous decisions in this court. E.g., Peter Kiewit Sons' Co. v. United States, 109 Ct. Cl. 517, 74 F. Supp. 165 (1947); Chernus v. United States, 110 Ct. Cl. 264 (1948); Loftis v. United States, 110 Ct. Cl. 551, 76 F. Supp. 816 (1948); Joseph Meltzer, Inc. v. United States, 111 Ct. Cl. 389, 77 F. Supp. 1018 (1948), and Fehlhaber Corporation v. United States, 138 Ct. Cl. 571, 151 Supp. 817, cert. denied 355 U.S. 877 (1957). To do otherwise, and hold the contractor to its original lump-sum bid, would negate one of the prime reasons for incorporating a “changed condition” article into these contracts, i.e., “to induce bidders not to increase *842 their prices to cover possible misfortunes which might result from unforeseen developments.” Chernus v. Untied States, supra, at 267. This is true even though the Army attempted to protect itself by inserting caveatory and exculpatory provisions in the contract. The plaintiff had no opportunity to properly investigate and so had a right to rely on the Government’s estimate. Fehlhaber Corporation v. United States, supra.
However, the further conclusion of the Board that recovery should be limited to the excess acreage over IS percent is not based on any strong legal ground. No previous case in the court has dealt specifically with this question. Normally if the plaintiff proves a material change in these construction cases, the court allows recovery for the entire change.[3] Apparently the Government has never before contended that recovery should be limited to the excess above a set “reasonably foreseeable overrun.” None of these cases, however, have been lump-sum contracts for the clearing of land.
Whether this ruling of the Appeals Board limiting the plaintiff’s recovery to the excess over 15 percent was correct at law, we need not decide. As previously stated, the general release executed by Tri-States abrogated whatever claim at law there was against the Government for payment of the 15 percent. However, in determining whether the subcontractor has an equitable claim as defined by this court in congressional reference cases it is not necessary for us to first determine if the Board was correct at law. Bather, we look solely to see if the subcontractor, in the facts and circumstances here involved, was unfairly dealt with by the Government.
From the testimony before the Appeals Board and the trial commissioner, it is evident that not only was 30 days *843 Insufficient for investigating this large and oddly contoured tract of land, but also that bidders cannot financially afford to survey every large project prior to bidding on it. When time does allow, the bidder normally visits the site and through detailed observation arrives at an accurate estimate of the work involved. In the case before us, however, accurate estimates were not possible within the time allotted. The Government, therefore, furnished approximations of the wooded acreage involved. These estimates were to be used in preparing bids, yet the Government stated it would not guarantee the estimates. The successful bidder was to be held responsible for clearing whatever trees and brush were actually encountered. The bidders thus faced an unusual risk.
The Government now concedes that there was a mutual mistake of fact and that the estimate furnished by the Corps of Engineers was off by 39 percent in favor of the Government. It further concedes that the bidders cannot be held to have inflated their cost estimates to cover this 39 percent overrun. Yet the Government does feel that the bidders should have blown up their prices to guard against a 15 percent error in the Army’s figures. Is this equitable?
The evidence presented is inconclusive on whether, in the clearing industry, bidders expect reimbursement for overruns. Certainly the evidence indicates that, when the contract states the precise acreage without qualifying language, any overrun will be paid for regardless of its amount.[4] But, of course, this is not the situation present, here.
The Appeals Board found, and we agree, that a bid of $200 per wooded acre was adequate for clearing 2,828 wooded acres plus random trees, brush, and fences. The actual cost incurred by the subcontractor, without profit, in clearing the entire 3,923 wooded acres was aboiit $190 per acre. If the Government’s estimate had been accurate, the subcontractor would have not lost any money.
It may be contended that the plaintiff should have expected some overrun. The bid specifications did state that the “2,828 acres” was approximate and the contractor would be obligated to clear all trees and brush actually encountered. *844 But at a cost of $200 per acre, an overrun of 15 percent amounts to $84,800. This appears to be quite a financial burden to place upon a contractor, especially when the bidders had no choice but to rely on the Government’s estimate; there being insufficient time for individual estimates.
In addition, the Government should have disclosed to the plaintiff that the aerial photographs from which the Army estimated the wooded acreage were 3 years old. A professional forester testified that in 3 years’ time new trees could have grown to a height of 12 to 16 feet and to a diameter of 2 inches. The age of the photographs could therefore have been very helpful to the plaintiff in preparing its cost estimate.
In conclusion, the Government witnesses testified that aerial photographs are used rather than on-site surveys in preparing work estimates because of the cost involved. This is so even though it results in inaccurate estimates; accuracy being only obtainable from the ground. Yet in this instance the Corps of Engineers did not even use up-to-date photographs, nor did it allow time for bidders to check the accuracy of the estimate. In addition, the word “approximate” was used in an attempt to place all the risk of using the estimate upon the bidder. The witnesses for the Government could not say whether this use of “approximate” on Invitations for Bids was a common practice by the Corps of Engineers or not.
In these circumstances we feel that the expenses involved in clearing the 15 percent overrun should be shared by the Government and the subcontractor. There is something to be said on either side. The Government received the full benefit of the work performed; a clearing job which the Government inspector considered very satisfactory. This amounted to 424 acres at a cost of $84,800 to the subcontractor. On the other hand, the “2,828” figure was an estimate and there was no guarantee that an overrun would not occur. The plaintiff could have reasonably anticipated some excess acreage. Apparently there was a mutual mistake of fact. Neither party expected a 30 percent overrun. The Government made no attempt to check the accuracy of its estimate and did not allow plaintiff sufficient time to do so.
*845 When all the facts are considered we think that, even with some tolerance for a reasonable overrun, there is full justification under our congressional reference jurisdiction for allowing an equal division of this excess cost of clearing 424 acres. We therefore recommend to the Congress that it pay the subcontractor, Tri-States Construction Company, Inc., $42,400. In the circumstances, we do not find that the subcontractor should be compensated for any of the other claims: liquidated damages, counsel fees, etc.[5]
Since the prime contractor, Schutt Construction Company, has suffered no damages as a result of this Government contract, we find that it is not entitled to share in the recovery.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Eepresentatives pursuant to its resolution of reference.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Eichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation duly organized and existing under the laws of the State of Wisconsin, with principal offices in Genoa, Wisconsin. Yellow Pine Lumber Company is a partnership consisting of J. T. Prine and J. M. Cooper, with principal offices in Chipley, Florida. Tri-States Construction Company, Inc., is a Florida corporation with principal offices in Chipley, Florida.
2. (a) On June 1, 1958, defendant (through the District Engineer, Army Corps of Engineers, Nashville, Tennessee) solicited lump-sum competitive bids, to be opened July 1, 1953, for the clearing of all trees and brush growing below contour 445 on the banks of the Cumberland Eiver and its tributaries from mile 218.8 to mile 231.5, i.e., for 21.2 miles on each side of the river, or a total bank length of 42.4 miles. The work was divided into 15 units or tracts, each of which, and the estimated acreage in each, was shown in tables on a drawing. Specification provision SW-l(a) (2) contained the statement “The total area below clearing limits contains *846 approximately 10,480 acres.” Specification provisions SC [Special Conditions]-3 (a), (b) and (d) stated as follows:
(a) General. — A brief description of each tract and the estimated acreage therein are shown in the tables on the drawing. Within the limit of available funds, the contractor will be required to complete the work specified herein in accordance with the contract and at the contract price, whether it involves quantities greater or 'less than the estimated amounts so listed.
(b) Estimated Quantities. — The tract acreages listed on the drawings are not guaranteed and are furnished for information only. The tract areas listed, however, will be used as a basis for the computations used in the preparation of estimates for partial payments. The total acreage below clearing limits is approximately 10,480 acres.
# # * >N *
(d) Bidding Units. — The area to be cleared in Group 1, comprising Segments A, B, C, T> and E, and parts of Segments F and G, is divided into fifteen units for bidding, and bidders may submit bids on any or all of the fifteen units. Each unit is in the segment indicated by the unit number, and the approximate acreage is as tabulated below:

(b) From an inspection of the site it could be observed that farmlands, pastures, etc., requiring little, if any, clearing, constituted a very large percent of the total area. The boundaries of the wooded areas were so irregular as to render impossible, within the 30-day period allowed for bidding, an *847 intelligent or reasonably accurate estimate of the number of acres which, required any substantial amount of clearing.
3. To obviate the impediment to bidding referred to in finding 2(b), the specifications were, by Addendum No. 1 issued to prospective bidders on June 19, 1953, amended as follows:
(a) The total acreage figure of 10,480 on one of the drawings was changed to 10,664.
(b) The figure in the sentence: “The total area below clearing limits contains approximately 10,480 acres” contained in specification SW-l(a) (2) was changed to 10,664.
(c) Specification provision SC-3 (b), set forth in finding 2(a), was amended by adding at the end thereof the following:
Areas shown cross-hatched on the drawings as “wooded areas” are approximate, and were taken from aerial photographs of the reservoir area. Trees, brush, fence rows, etc. will be encountered in areas not crosshatched and are to be included in the clearing work. The following tabulation of cross-hatched areas on the drawings is presented for information of bidders:

(d)The acreage of Unit G-l in the table in paragraph SC-3(d) was changed from 993 to 1,177, and the total acreage from 10,480 to 10,664.
4. The aerial photographs mentioned in the above-quoted amended specifications were flown during March, April and *848 June 1950, or 3 years prior to preparation of tbe contract drawings. Bidders were neither informed of the dates of the photographs nor were they invited to see them.
5. Plaintiff submitted a lump-sum bid of $565,946.85 for the clearing of all 15 units of work. Yellow Pine Lumber Company submitted a bid in the sum of $642,455. The Government’s estimate, exclusive of profit, was $885,000. The contract was awarded to plaintiff. On the basis of 2,828 “wooded” acres, and reducing all lump-sum bids received to a per acre basis, the average bid was $262.02 per acre. Plaintiff’s bid was on a basis of approximately $200 per acre. Bids over the average were $277.93 per acre, $327.02 per acre, and $343.71 per acre. The Government’s estimate, without profit, was $312.94 per acre. However, on such 2,828 “wooded acre” basis, and on the further basis that “wooded” acres would include areas of heavy brush, the cost of clearing such brush being comparable to the cost of clearing an area of trees, plaintiff’s bid was adequate.
6. Plaintiff, as prime contractor, entered into Contract No. DA-40-058-Eng-1966 with defendant, acting by a contracting officer of the Army Corps of Engineers, Office of the District Engineer, Nashville District, for the performance of the clearing work hereinabove described. The contract, dated July 16, 1953, recited that it was for the clearing of trees and brush from certain banks of the Cumberland Diver and its tributaries which constituted a portion of the site of the reservoir of the Old Hickory Lock and Dam, near Nashville, Tennessee. Plaintiff subcontracted the work in its entirety to Yellow Pine Lumber Company for the lump-sum price of $509,352, which, on the basis of 2,828 acres, amounts to $180.11 per acre. Yellow Pine performed the work until December 27,1953, when its successor, Tri-States Construction Company, Inc., succeeded to all the rights and duties of Yellow Pine under the subcontract. Tri-States then completed the work. J. T. Prine was general manager of Yellow Pine and of Tri-States. The term “plaintiff” will hereinafter sometimes be used as if Schutt were actually the performing contractor. Yellow Pine, having submitted its own bid to defendant, was fully conversant with the plans *849 and specifications and knew the amounts of all bids and of the Government’s estimate.
7. The contract included the following provisions:
3. ChaNges and Extras. — The contracting officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an' equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the contractor for adjustment under this Clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of extra or change: peovided, howevee, That the contracting officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the contractor from proceeding with the prosecution of the work as changed.
4. Changed Conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
5. Delays — Damages.—(a) Termination for Default. If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such dili- *850 fence as will insure its completion within the time speci-ed in the contract, or any extension thereof, or fails-to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has ’been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby, and for liquidated damages for delay, as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.
(b) Damages for Delay. If the Government does not terminate the right of the contractor to proceed, as provided in subparagraph (a) hereof, the contractor shall continue the work, in which event he and liis sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day or delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.
(c) Time Extensions. The right of the contractor to proceed shall not be terminated, as provided in subpara-graph (a) hereof, nor the contractor charged with liquidated or actual damages, as provided in subparagraph (b), 'because of any delays in the completion of the work due to causes beyond his control and without his fault or negligence, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, or negligence, including, but not restricted to, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes: Provided, That the contractor shall, within 10 days from the beginning of any such delay, unless the contracting officer shall grant a further period of time prior to the date of final settlement of the contract, notify the contracting officer in writing of the causes of *851 delay. The contracting officer shall ascertain the facts and the extent of the delay and extend the time, for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in the “Disputes” Article hereof.
6. Disputes. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who* shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with theperformance of the contract and in accordance with the Contracting Officer’s decision.
8. With respect to commencement and completion of the work and liquidated damages for delays, the specifications, as amended, provided as follows:
SG-l. COMMENCEMENT, PROSECUTION, AND COMPLETION. — The contractor will 'be required to commence work under this contract within 10 calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, to complete all clearing work below the general flood plain level (approximate elevation 420) not later than 130 calendar days after date of receipt by him of said notice to proceed, and to complete the entire work ready for use not later than 300 calendar days after date of receipt by bim of said notice to proceed. The time stated for completion shall include final clean-up of premises.
*852 SC-2. Liquidated Damages. — In case of failure on the part of the contractor to complete the work within the time fixed in the contract or any extensions thereof, the contractor shall pay the Government as liquidated damages the sum of $50.00 for each calendar day of delay until the work is completed or accepted. This provision shall apply to each of the completion dates indicated in paragraph SC-1, for each and every contract which may be entered into as a result of this invitation.
9. Yellow Pine Lumber Company was experienced in clearing work and had profitably performed such work in other reservoir areas. At the time it accepted the subcontract price of $509,352, it was reasonably of the opinion that 2,828 wooded acres profitably could be cleared along with non-wooded areas containing some random trees, brush and fence rows, for an average of approximately $180 per acre. At that time it also believed that approximately $36,000 would be realized from the sale of salvageable timber. However, it turned out that only $16,000 to $18,000 of income came from that source.
10. Notice to proceed was received by plaintiff on August 5, 1953, thus establishing December 13, 1953, for completion to elevation 420, and June 1, 1954, for completion of the “entire work.” The period for performance of the “entire work” was, by a change order requiring certain extra work, extended to June 7, 1954. No extensions were granted for completion to contour 420. Liquidated damages were assessed in the sum of $9,900. The contract work was completed on July 3, 1954. For its own convenience, the subcontractor elected to clear the land to the top elevation of 445 as one operation rather than clearing to elevation 420 first, so as to meet the performance period therefor of 130 days. The subcontractor preferred to pay $50 per day as liquidated damages rather than to bear the extra expense of first clearing the entire project to the lower elevation and then returning to the higher elevation.
11. Insofar as the performance of the clearing work was concerned, plaintiff satisfactorily completed the contract. However, by the time plaintiff completed its work, it had actually cleared, including areas of heavy brush, 3,923 “wooded” acres instead of the 2,828 mentioned in the speci- *853 fixations and drawings, constituting 1,095 additional acres. During the course of contract operations, both the subcontractor and the Government inspector on the site had concluded that, based on the 2,828 figure, a substantial overrun was being encountered.
12. On July 12,1954, 9 days after completion of the work, plaintiff informed the contracting officer that the “wooded areas” actually encountered greatly exceeded those indicated by the drawings and specifications and that it was causing a survey to be made to determine the exact acreage of the “wooded areas” it had cleared. The contracting officer was invited to assign a competent member of his staff to observe and check the survey in the field. However, the contracting officer did not make such assignment.
13. A formal claim was filed on July 31, 1954. In the claim, plaintiff stated that it had computed its bid upon the average basis of approximately $200 per acre and that it was therefore claiming such amount per acre on the acreage cleared in excess of 2,828 acres, or an estimated total of $150,000, subject to the exact amount of the excess as would be shown by the survey being conducted. It also sought remission of the liquidated damages assessed (stated to be $11,600), claiming that its delayed completion of the work was due to the clearing of the excess wooded acreage. By letter dated September 7, 1954, the contracting officer, after considering the claim on the merits, disallowed it on the ground that an overrun in quantities as alleged by plaintiff did not constitute a changed condition within the purview of article 4 of the contract. He made no attempt to ascertain, prior to rendering his decision, whether more “wooded” acres than shown in the specifications had in fact been cleared.
14. (a) Plaintiff appealed the contracting officer’s decision to the Corps of Engineers Claims and Appeals Board. On the appeal, plaintiff claimed compensation at $200 per acre on 1,123 acres, which was the number of acres in excess of 2,828 which it contended its completed survey indicated, being a total of $224,600. It also claimed return of liquidated damages (computed as $12,855.81), and allowance of its survey expenses, stated to be $11,428.03. After a 4-day hearing *854 in May 1955, the Board rendered a decision dated November 30, 1955, denying the appeal. However, plaintiff’s motion for a rehearing was granted and such a rehearing was held on April 30 and May 1, 1957. On January 2, 1958, the Board unanimously set aside its decision of November 30, 1955. It concluded that areas of heavy brush should be included within the term “wooded areas”; that the specifications, properly interpreted, were intended to furnish:
an approximate measure of the work to be done and reasonably may be construed as a statement of fact, or an assumption for the purpose of bidding, that all clearing of any substance or consequence would be found within approximately 2,828 acres although random trees, brush, fence rows, etc., would be found outside the cross-hatched area. Under such specifications there was little or nothing that a bidder could do other than make an estimate of the cost of clearing one acre, multiply by 2,828, more or less, making an allowance for reasonable overruns or underruns, and add a reasonable sum for the random trees, brush and fence rows. Certainly it was not the intent of the specifications to impose a gamble upon bidders with respect to substantial areas of costly brush clearing;
that, including areas of heavy brush, plaintiff cleared 3,923-“wooded acres”; and that “there having been a sizable overrun, therefore, in the number of wooded acres encountered, in comparison with the number approximated in the bidding documents, ‘changed conditions’ exist within the meaning of the contract article bearing that title, * *
The Board also held that plaintiff’s claim of $200 per acre was reasonable. However, in connection with the amount of the equitable adjustment, the Board further held that such $200 per acre allowance should not be applied to the entire acreage in excess of 2,828, but only to the acreage in excess of a 15 percent overrun, which variation it concluded was allowable as falling within the term “approximate” as. applied by the specifications and drawings to the 2,828 figure,, and therefore not compensable. During the course of the-appeal proceedings, plaintiff reduced the number of excess-, acres claimed from 1,123 to 1,095, which figure the Board, accepted as proved and which, added to the 2,828 specification figure, gives the 3,923 figure set forth in the Board. *855 opinion. Fifteen percent of 2,828 acres, which the Board held plaintiff was obligated to clear without extra compensation, is 424 acres, which, added to the 2,828 figure, gives the total of 3,252 acres. This left 671 wooded acres (3,923 minus 3,252) for which the Board allowed compensation at $200 per acre, or a total of $134,200.
On this 15 percent issue, the Board stated:
As stated in Appeal of Perini, Walsh, Mills & Blythe Bros., [C&A Nos. 865 & 971] * * *, a further question remains to be resolved. The “Changed Conditions” article is not invoked from the very first acre by which the conditions encountered differ from the number of acres estimated. The article itself speaks of conditions “materially” differing from those indicated, and, as stated in the cited case, “Some degree of materiality is required before the article comes into play.” What that overrun or underrun must be to constitute a material difference would vary with the circumstances in each case.
In this case, the percentage of overrun which should be permitted prior to adjustment, would be comparatively small because the “estimate” related to a figure which was stated with unusual precision, namely, 2,828 acres, and because the consequences in cost to the contractor for every acre that the estimate was exceeded were severe.
The foregoing considered, it would appear that a 15 percent overrun (or underrun) would be permissible before adjustment of the contract price would be in order.
We are of the opinion that a variation of 15 percent reasonably is within the true intent and meaning of the term “approximate” when construed in the light of other language of the contract hereinabove-quoted. In other words, we hold that the appellant was obligated to clear a minimum of 2,404 and a maximum of 3,252 wooded acres without an adjustment of the contract price. It follows that the appellant is entitled to an equitable adjustment increasing the contract price by $134,200.00 for the additional 671 wooded acres at $200.00 per acre.
(b) As to the remission of the liquidated damages assessed, the Board made a partial allowance. On this issue it held:
The appellant has not shown that any excess of wooded acres were encountered below contour 420. Accordingly, no extension of time can be computed or allowed by this Board for the work below that contour. The con *856 tract allowed 300 calendar days for completion of the work above contour 420. The appellant is entitled to a commensurate extension of time for performance of that portion of the work.
(c) The Board denied the portion of the claim relating to reimbursement of the survey expenses. On this item, the Board stated:
It is well-settled that the expenses of preparing a claim are not recoverable. Accordingly, the claim for the cost of making the survey is denied.
15. Pursuant to the Board decision, plaintiff, by Change Order No. 2, dated January 7, 1958, was paid the amount of $134,200 for the clearing of 671 acres at $200 per acre. By the change order, plaintiff was also allowed an extension of time of 24 days for the completion of the “entire work.” At $50 per day, this allowance resulted in the remission of $1,200 in liquidated damages. Thus, plaintiff was paid the total amount of $135,400 as a result of the Board decision.
16. (a) On March 12,1958, plaintiff paid Tri-States Construction Company $77,805.36 and Tri-States thereupon executed the following release:
GENERAL RELEASE
Received of Schutt Construction Company, Inc., a Wisconsin corporation, of Genoa, Wisconsin, the sum of Seventy-Seven Thousand Eight PIundred Five & 36/100 ($77,805.36) Dollars by check, in full payment and satisfaction of any and all liability, indebtedness or obligation, if any, of said corporation to the undersigned arising out of or in any way resulting from the Old Hickory Lock and Dam Reservoir Clearing Project, Government Contract #DA-40-058-ENG-1966, at Old Hickory, Tennessee, or any work thereon, this constituting a full and absolute release of said corporation only.
Dated this 12 day of March, 1958.
In Presence Of:
(S) W. F. Carpenter (S) J. M. Cooper, Jr.
(S) G. C. Loefplad (S) J. T. Prine
Tri-States Construction Company,
By (S) J. M. Cooper, Jr.,

President.

*857 (b) The United States Fidelity & Guaranty Company was plaintiff’s bonding company, and the law firm of Good-pasture, Carpentei', Dale & Woods of Nashville, Tennessee, acted as the attorneys for plaintiff in handling the claim before the contracting officer and the Appeals Board.
On March 12,1958, plaintiff paid said law firm $15,997.64, $21,360 thereof being for attorneys’ fees, and the balance of $24,637.64 being for the bonding company, and said law firm thereupon executed the following release to plaintiff:
GENERAL RELEASE
Received of Schutt Construction Company, Inc., a Wisconsin corporation, of Genoa Wisconsin, the sum of Forty-Five Thousand Nine Hundred Ninety-Seven & 64/100 ($45,997.64) Dollars, by check, in full payment and satisfaction of any and all liability, indebtedness or obligation, if any, of said corporation to the undersigned arising out of or in any way resulting from the Old Hickory Lock and Dam Reservoir Clearing Project, Government Contract #DA-40-058-ENG-1966, at Old Hickory, Tennessee, or any work thereon, this constituting a full and absolute release of said corporation. Said payment is received on account of attorneys’ fees and for the account of claim of United States Fidelity & Guaranty Company. The amount of attorneys’ fees is $21,360.00 and the claim of United States Fidelity & Guaranty Company is $24,637.64.
Dated this March 12,1958.
In Presence Of:
(S) W. F. Carpenter
(S) G. C. Loeeelad
Goodpasture, Carpenter, Dale & Woods, Attys.
By: /S/ J. C. Dale, Jr.
The amount paid to the surety represented the amount theretofore advanced by it to Tri-States ($23,287.64), plus $1,350 as additional bond premium (1 percent of the additional payment by defendant of $135,400).
17. Plaintiff here contends that the Board erred as a matter of law in refusing to compensate it for the 424 acres it cleared which constituted 15 percent over the 2,828 acres. It claims $200 per acre therefor, or $84,800. The $200 per acre figure is reasonable. The actual cost incurred by the subcon *858 tractors, without profit, was $189.91 per acre, on the basis of 3,923 wooded acres.
18. It is a custom in the clearing industry that, if a representation is made without any qualifying contractual language as to the precise number of acres to be cleared, and where there is no provision in the contract such as the article 4 “Changed Conditions” provision, no overrun or underrun is to be expected by the clearing contractor. If such an overrun or underrun occurs under such circumstances, it is customary in the industry that the contractor either be paid for it or a deduction be made from his final payment, as the case may be. In such an instance, it is not customary in the industry that any percentage of the total acreage to be cleared must be expected as a reasonable overrun before the contractor gets paid.
19. Plaintiff claims the balance of the liquidated damages assessed which have not been remitted by defendant. A total of $9,900 was assessed. $1,200 was remitted as a result of the Board’s decision, leaving a balance of $8,700.
The record does not support this item of claim (see finding 10), nor is there any showing that the Board’s disposition of the item was in any way erroneous.
20. Plaintiff also claims reimbursement for the cost of the survey it made to prove the extent of the overrun. Plaintiff has established on the basis of this survey that there was an overrun to the extent of 1,095 acres. The costs incurred in having this survey made were $10,518.14.
21. As shown by finding 16(b), $21,360 was paid to plaintiff’s attorneys for the administrative handling of the claim. Plaintiff also claims reimbursement of said amount.
22. Also claimed is an item in the amount of $6,770 which is 5 percent of the $135,400 paid to Schutt pursuant to the Board decision. Schutt at first retained for itself 10 percent of said sum, or $13,540. Subsequently, however, on the subcontractor’s protestations that Schutt had agreed that it would retain only 5 percent of any sum recovered from the Corps of Engineers with respect to the claim, Schutt paid to Tri-States one-half of said amount of $13,540, thus retaining only $6,770. On behalf of the subcontractor Tri-States, *859 claim is here made for said sum of $6,770 which, was retained by Schutt.
23. The bond premium of Schutt’s surety was 1 percent of the contract price. As shown, as a result of the increase in the contract price resulting from the $135,400 payment made to Schutt by defendant following the Board decision, an •additional $1,350 was paid to the surety (finding 16(b)). Reimbursement of this additional bond charge item is here claimed.
24. Plaintiff contends that, in addition to the $21,360 in fees paid to its attorneys in connection with the prosecution of its claim administratively, it reimbursed said attorneys the •amount of $5,300 for costs and expenses (including traveling expenses for the attorneys and for plaintiff’s witnesses) incurred in connection with the two Board hearings. Plaintiff produced 13 witnesses at the first hearing and 3 at the second. It here seeks reimbursement of said amount of $5,300. However, this item of claim is unverified and otherwise not •established.
25. (a) On February 2, 1959, there was introduced in the House of Representatives, 86th Congress, 1st session, House Bill H.R. 3958, which read as follows:
A BILL
For the relief of the Schutt Construction Company, Inc.
Be it enacted, by the Senate and House of Representatives of the United States of America in Congress assembled., That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Schutt Construction Company, Inc., Genoa, Wisconsin, for itself and on behalf of its subcontractor, Yellow Pine Lumber Company, Chipley, Florida, and said subcontractor’s successor, Tri-States Construction Company, Inc., Chipley, Florida, the sum of $142,694.64. The payment of such sum shall be in full settlement of all claims of the said Schutt Construction Company, Inc., the said Yellow Pine Lumber Company, and the said Tri-States Construction Company, Inc., arising out of contract numbered DA-40-058-ÉNG-1966, dated July 16, 1953, with the United States, for the clearing of lands on the site of the reservoir of the Old Hickory lock and dam in Davidson, Sumner, and Wilson Counties, Tennessee: *860 Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
(b) On June 23,1959, the House agreed to House Resolution 282, which read as follows:
Resolved, That the bill (H.R. 3958) entitled “A bill for the relief of the Schutt Construction'Company, Inc.”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections, and report to the House of Representatives at the earliest practicable date, giving findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable against the United States, and the amount, if any, legally or equitably owing by the United States to the claimant.
26, The petition herein was filed on September 24,1959.

 Since the petition in this ease was filed and substantial evidence taken prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Consequently, defendant’s suggestion of lack of jurisdiction to entertain congressional references is rejected.

 In Hellander v. United States, 147 Ct. Cl. 550, 178 F. Supp. 932 (1959), where a general release was involved, this court denied an equitable recovery. However, the claim was primarily denied because it was without merit and because the plaintiff had not attempted to pursue his administrative remedies.

 In Loftis v. United States, supra, the plaintiff recovered at an Increased trait price for all the unforeseen excavation; in Joseph Meltzer, Inc. v. United States, supra, the entire cost of constructing a new cofferdam was recovered where its initial collapse was caused by unforeseen conditions; in Fehlhaber Corporation v. United States, supra, at 585, we stated, “Plaintiff should, therefore, be reimbursed to the extent that the changed conditions caused it to incur expenditures in excess of that which would have been incurred had the subsurface been as reported by the specifications.” In Peter Kiewit Sons’ Co. v. United States, supra, and Chernus v. United States, supra, the court did not reach the issue of the amount of recovery.

 See Finding of Fact 18.

 See Findings of Fact 17 to 24.