**WINN–SENTER CONST. CO. v. UNITED STATES.**

**GEER CO. v. SAME.**

**SOTHMAN CO. et al. v. SAME.**
Nos. 45999, 46592, 46593.
Court of Claims.
Jan. 5, 1948.

Clifford B. Kimberly, of Kansas City, Mo. (J. L. Milligan, Thos. E. Deacy, Clifford B. Kimberly and Milligan, Kimberly & Deacy, all of Kansas City, Mo., on the brief), for plaintiffs.

James J. Sweeney, of Washington, D. C., and Peyton Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The plaintiffs made contracts with the Government to perform parts of the construction of the Cornhusker Ordnance Plant at Grand Island, Nebraska. The plaintiff in the first named suit had a separate contract, the plaintiff in the second named suit had two contracts and the two plaintiffs in the third named suit had, as joint contractors, two contracts. Each contract was a separate contract. The cases are treated together because the same findings of fact relate, in large part, to all of them, and the issues involved are, with exceptions that will be stated, the same.

All of the contracts here in suit were lump sum contracts. They were made after bids had been submitted pursuant to a public invitation for bids. Because of the necessity for haste in getting the work started, letter contracts rather than full formal ones were issued at first, late in April or in May 1942. Formal contracts were signed in May, June, or July. Work was begun on each of the contracts within 5 days after each letter contract was issued.

Before the plaintiffs' contracts were entered into, the Government had made a cost plus fixed fee contract with a corporation and an individual whereby those contractors jointly agreed to perform all architectural, engineering, and management services necessary in the construction of the plant to which the plaintiffs' contracts, later made, related. In the findings and in this opinion, the joint contractors in that contract are called the A. E. M. That contract contemplated that most of the actual construction of the plant would be done by other contractors, but it provided that the A. E. M. should assemble a force of supervisors and skilled workmen to perform any work which was not awarded to other contractors. It provided that the A. E. M. should direct and supervise the work of all the construction contractors. The A. E. M. employed a force of carpenters and laborers to perform any work not contracted out to others, and to take over and complete any work on which other contractors were delayed. It operated a personnel and labor procurement office, and all labor, except supervisory labor, which the plaintiffs and other contractors used, was obtained by requisitions on the A. E. M. All labor, with the same exception was cleared by the A. E. M. through the offices of the United States Employment Service.

The contracts of the plaintiffs and the A. E. M. with the Government required them to pay not less than the prevailing wage in the area as determined by the Secretary of Labor and stated in the specifications. These provisions of the plaintiffs' contracts are set out in finding 6. In the A. E. M.'s contract and the plaintiffs' contracts the prevailing wage for carpenters was stated to be $1.12½ per hour and for unskilled labor $.50 per hour.

The A. E. M. arrived on the project about April 8, 1942. Investigation of the labor market and supply showed that other projects which drew labor from the same sources were paying higher wages than those stated above, and the A. E. M. thought that its project could not be adequately manned at these wages. It immediately asked the Area Engineer, who was the Contracting Officer, to obtain an increase in the wage rates. On May 30, it

sent a letter to the Area Engineer pressing for action on this request and asking that the rates be set at $1.25 for carpenters and $.60 for laborers. This letter, quoted in finding 11 describes the situation as the A. E. M. found it. The letter was sent by the Area Engineer, who was the Contracting Officer, to the District Engineer, whose office was at Omaha, together with a recommendation that the increases be authorized. By telephone and teletype the question was presented to the Chief of Engineers who sent to the Division Engineer, who was also at Omaha, a teletype message, which we have quoted in finding 13, authorizing the increases requested and saying "Wage adjustment order in process of issuance." This message was sent down through channels to the Contracting Officer, whose office notified the A. E. M. and said "Please inform all interested parties." On June 11 the A. E. M. wrote the plaintiffs giving them the information. On June 19 the Area Engineer's Office wrote the plaintiffs stating that the wage rates had been increased and saying "It is requested that you change your rates accordingly." On June 20 and 22 the Office of the Area Engineer sent letters to the plaintiffs returning pay rolls to them for correction and requiring that they pay the increased rates retroactively to carpenters to June 1 and to laborers to June 8. The plaintiffs made the retroactive increases, and paid the increased rates during their entire performances of their contracts.

A Mr. Knox, General Manager of the A. E. M. held weekly meetings in his office at the project, attended by the Contracting Officer, the various contractors, and the supervisory personnel of the A. E. M. At a meeting about June 11, the plaintiffs complained about the additional costs they would incur in paying the increased rates, and asked what action would be taken to reimburse them. Mr. Knox said, in the presence of the Contracting Officer, that when the contracts were completed and the additional costs could be determined, each contractor would be reimbursed by being given a change order.

After some telephone conversations which are shown in our findings and not repeated here, the wage adjustment order

promised in the Chief of Engineers teletype of May 30 came through to the Contracting Officer on July 16. It made authorized increases applicable only to the A. E. M. contract. The plaintiffs were so notified. However, they continued to pay the increased wages, and it would not have been possible for them to do otherwise.

The communication of May 30 from the Chief of Engineers referred to the Cornhusker Ordnance Plant, and the wage "rate for this project." By its plain meaning and as it was interpreted by everyone who read it, it applied to all the carpenters employed by all contractors at the project.

The statements of wage rates in the plaintiffs' contracts and the A. E. M. contract were made pursuant to the Davis Bacon Act, 54 Stat. .399, 40 U.S.C.A. § 276a. That act requires that a contractor with the Government bind himself to pay not less than the wages found by the Secretary of Labor to be the prevailing wages in the area where the contract is performed. The act expresses the purpose of the Government not to profit by using a contractor who keeps costs down by paying sub-standard wages. Neither it, nor any other law force at the time here in question, put any ceiling on wages to be paid by lump sum Government contractors such as the plaintiffs. They, by making their contracts agreed to pay whatever wages they had to pay to get the labor necessary to do the job.

The A. E. M., a cost-plus contractor, on the other hand, had agreed in its contract, as shown in finding 11, that it could not include in its costs any wages paid in excess of those approved in writing by the Government Agency with which it contracted. It was, therefore, necessary for it, to avoid an actual out-of-pocket loss of money, to secure the approval of the Chief of Engineers before it began to pay higher wages. The A. E. M. must have realized that whatever wages it paid to its direct employees, if higher than the contract minimum, would, in the circumstances, become the standard wages for the project which other contractors would have to pay. All the help used by all the contractors was recruited through the labor office of the A. E. M., and the finding of the Commissioner of this court, not excepted to, was, and our finding is, that the payment of different rates by different contractors would have been impractical.

The A. E. M., aware that such an action was necessary, had a right to ask the Government to approve wage increases. A lump sum contractor, such as the plaintiffs were, had no need to consult the Government about increasing wages. Such a contractor was privileged, indeed he was obliged, to pay whatever he had to pay to get the work done. And if he did so, he clearly had no claim against the Government for his increased costs.

The Chief of Engineers sent down an informal order requiring the plaintiffs, and all other contractors, to increase wages. When his formal order came along six weeks later, it did not order the plaintiffs to increase wages. But they had already done so and could not retrace the step taken. The difference between the informal order and the formal one may be accounted for either on the ground that the informal one was mistakenly worded, or that the Chief of Engineers had, in the interval, changed his mind, and decided that he had no power to order the plaintiffs to increase their wages, which would have been true, or that it was unwise to do so since it might give the plaintiffs a plausible claim against the Government for reimbursement, which is what has actually happened as a result of his informal order.

The Government urges that no Government agent has the power to order a lump sum contractor to increase wages and to validly contract that the Government will reimburse him for the increase. We suppose that in the absence of misrepresentation or other special circumstances, that is true. It would be no more than an act of generosity which, we suppose, no Government authority except Congress has the power to do. Hence, the Government urges, all the acts of its agents upon which the plaintiffs rest their cases were unauthorized and are irrelevant. It says that when the plaintiffs were ordered to increase their wages, they should have refused to obey the unauthorized order. It cites Mr. Justice Holmes' statement in Morrisdale Coal Co. v. United States, 259 U.S. 188, 190, 42 S.Ct. 481, 66 L.Ed. 892: " * * * the remedy

is, if necessary, to refuse to obey it, not to sue the lawmaker."

We think that it would not have been practicable to refuse to obey the order to raise wages. But we think that it would have been equally impracticable for the plaintiffs to have escaped making wage increases if the informal order had, as the formal one did, limited itself to the A. E. M. and not included the plaintiffs at all. Our Commissioner's finding, referred to above, and not excepted to, makes this plain.

■ We have added to the Commissioner's findings a finding that the plaintiffs could not have performed their contracts without increasing the wage rates beyond the minima set out in their contracts. These being suits for breach of contract, the plaintiffs had the burden not only of proving that there were breaches, but that they were harmed by the breaches, and the extent of the harm, within measurable limits. In this case proof of the fact that they were harmed would require that they persuade us, on the evidence as a whole, that they would have been able to perform their contracts without increasing wages. There is practically no evidence so indicating. At the end of our finding 11 we have stated all that was offered as proof, that is, that on May 30, when the A. E. M. sent its letter requesting authorization to increase wages, Good workmen were scarce but, at that time, the plaintiffs had not experienced any unusual difficulties in obtaining an adequate labor force.

■ Findings 4 and 5 show that, at that time, the plaintiffs had been working on their contracts for only short periods of time. To the effect that it would not have been practicable for the plaintiffs to have performed their contracts without increasing wages, there is abundant evidence. The letter from the A. E. M. to the Area Engineer, quoted in our finding 11, gives facts strongly supporting the request made in it for authority to increase wages in order to get the plant built. The statements in this letter, made in the course of business by a responsible entity like the A. E. M. on this large project, is entitled to weight, In re Fennerstein's Champagne, 3 Wall. 145, 149, 18 L.Ed. 121, and should have been, if it

could have been, contradicted by the plaintiffs. Besides, Mr. Knox, General Manager for the A. E. M. on the project testified to the same effect at the trial, as did Mr. Carter, Chief Engineer for the A. E. M. whose deposition was taken by the plaintiff. The Labor Relations Officer on the project, in two letters to the District Engineer, which are Exhibits in the case, stated in detail the facts leading him to the conclusion that wage increases should be authorized.

■ Our conclusion is that if the Wage Adjustment Order issued by the Chief of Engineers had been limited to the wages to be paid by the A. E. M., in which case it would have been a proper and lawful order which that Officer would have had not only the power, but the duty to issue, if he thought the situation justified it, its effect upon the plaintiffs would have been, except in one particular hereinafter noted, the same as was the effect of the unauthorized order which he issued. This fact would prevent the plaintiffs from recovering with the exceptions stated above. We further conclude that the evidence shows that, in the absence of any order at all from the Government, the plaintiffs could not have performed their contracts without increasing wages.

■ We have noted an exception to the statement that the unauthorized order did not result in financial loss to the plaintiffs. As shown in our finding 20, the Contracting Officer's office on June 20 and June 22, 1942, required the plaintiffs to correct their pay-roll records retroactively and pay the increased wages for work beginning June 1 for carpenters and June 8 for unskilled laborers. These increased wages were for work already performed and paid for, and would not have been paid if their payment had not been required by the Government. We have been able to ascertain from the exhibits in the record, the amounts of these retroactive increases, and we allow the plaintiffs to recover these amounts. The orders to pay the retroactive wages were made by agents of the Government pursuant to their reasonable interpretation of an order issued by the Chief of Engineers. For the plaintiffs, in the haste and confusion of building this war project, to have refused to obey them, as Mr. Justice

Holmes suggested in the Morrisdale Coal Co. case, supra, and thus to have brought down on their heads the reprisals of the several officials who spoke with the authority of the Contracting Officer, would have been unthinkable, and, we conclude, was not required of them. The law, as between the Government and those who deal with it, should be law that it is possible to live by, not merely law that reads plausibly in the books. We think that, in the circumstances, it is not unfair to hold the Government responsible for the costs of carrying out an order of its Chief of Engineers, though the order was given by mistake.

The Government urges that the oral protests of the plaintiffs made at the time the orders were given them were insufficient to preserve their rights. This contention has no merit, since the plaintiffs were told by the General Manager of the A. E. M., in the presence of the Contracting Officer, that the question of reimbursement, which, as we have found, was the only question of any practical importance, could not be taken up until the contracts were completed and the costs ascertained. The adverse action of the War Department Board of Contract Appeals, acting for the Secretary of War, on the appeal of the plaintiff, Winn-Senter Construction Company, and the plaintiff, the Geer Company, was not conclusive because, as shown in finding 28, that Board in effect denied the jurisdiction of the Contracting Officer and itself to determine the question. The Government concedes that the failure of the joint plaintiffs, The Sothman Company and Jones-Hettelsater Construction Company, to appeal from the adverse decision in their case, does not prejudice them since that decision was not made by the Contracting Officer, as the contract provided, but by the District Engineer.

The Government urges that the plaintiff The Geer Company and the joint plaintiffs, The Sothman Company and Jones-Hettelsater Construction Company, are barred by unqualified releases made by them to the Government. The facts with regard to these releases are given in findings 30-34. The Geer Company executed its release while its claim was under consideration by the Government officials, which consideration continued after the release had been given. We think the conduct of both parties shows that they did not construe the release as an abandonment or forfeiture of this pending claim.

The release, unqualified on its face, given by the joint plaintiffs, The Sothman Company and Jones-Hettelsater Construction Company, was based on an element of coercion as shown in finding 33. When these plaintiffs resubmitted their claims, after the release had been given, their claims were considered, and not treated as barred by the release. Here, as in the case of The Geer Company, we think the contemporaneous construction was that the release was not intended to bar the claims.

The plaintiffs are entitled to recover the following amounts:

| | |
|---|---|
| Winn-Senter Construction Company | $1,887.91 |
| The Geer Company | 234.38 |
| The Sothman Company . and Jones-Hettelsater Construction Company | 810.27 |

It is so ordered.

JONES, Chief Justice, and HOWELL, WHITAKER and LITTLETON, Judges, concur.