SOUTHLAND ENTERPRISES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 612–84C.

United States Claims Court.

Dec. 9, 1991.

M. Cohen, Director, Commercial Litigation Branch and Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant. Gerald D. O'Nan, Denver, Colo., of counsel.

## OPINION

SMITH, Chief Judge.

This case is a direct-access appeal from the contracting officer's denial of plaintiff's requests for equitable adjustments, and comes before the court for disposition following a ten day trial. This dispute arises from a September 24, 1982 contract between Southland Enterprises, Inc. (Southland) and the United States Department of Interior, National Park Service (Park Service) for the construction of a roadway and bridges. Upon consideration of the evidence at trial, examination of the job site, and the post trial briefs, the court finds that the government's refusal to grant most of the equitable adjustments sought was clearly contrary to the law and the government's litigation position was not substantially justified. Accordingly, the court awards Southland damages in the amount of $743,861.90 plus interest, with a later determination on the amount of plaintiff's attorneys' fees.

## FACTS

In 1982, the Park Service's Denver Service Center initiated an Invitation for Bids for work at Davis Bayou, Gulf Island National Seashore, in Gulfport, Mississippi. The proposed unit price contract called for the construction of a road exiting from U.S. Highway 90. Specifically, Southland was to clear an area between U.S. 90 and Starks Boulevard, lay down road bedding, construct two bridges, and finish and grade the road. The first bridge was near U.S. 90 and crossed the L & N Railroad tracks and was designed at a slope of 1.5 to 1.0. The second bridge crossed Old U.S. 90 and had a slope of 2.0 to 1.0. Some parts of the road were to be constructed through a marshy area known locally as the "buttercup."

On September 24, 1982, Southland was awarded the contract. Its bid of $1,898,-

Thomas W. Prewitt, Jackson, Miss., for plaintiff.

E. Kathleen Shahan, with whom were Helene M. Goldberg, Asst. Director, David

120.80 was the lowest submitted. The Park Service had estimated the contract's value at $1,804,880.00. The contract contemplated completion within 365 calendar days of the date of the Notice to Proceed. The Notice to Proceed provided that work would begin on November 15, 1982, with a completion date of November 14, 1983. Southland immediately began clearing and grubbing the area upon which the road was to be built. It also began removing an estimated 500 cubic yards (c.y.) of unsatisfactory material[1] from the job site.

On December 14, 1982, the Park Service instructed Southland to temporarily cease its clearing and grubbing north of Old U.S. 90. The Park Service realized that there would be an overrun of approximately 18,500 cy of unsuitable material removed due to poor ground conditions. To avoid massive cost overruns for which it would be responsible, the Park Service issued Change Order Number 1 (Mod. #1) in March of 1983. Mod. #1 modified the design of the road. Instead of removing and replacing unsuitable material, Southland was to create a stable road base by laying filter fabric and a bed of shell and sand. An additional 90 days was added to the contract completion date. During the negotiations leading to the change order, Southland reserved its right to collect costs for delay and extended time.

The Park Service issued another five change orders,[2] pushing the contract completion date back to May 1, 1984. Work was not, however, completed by that date. The Park Service provided Southland a certificate of substantial completion on November 16, 1984. The Park Service assessed $37,250.00 in liquidated damages. Southland filed a claim with the contracting officer on May 30, 1984. It was denied on

September 10, 1984. On November 26, 1984, Southland filed the initial complaint in this case alleging damages of $304,402.58 due primarily to productivity, clearing and grubbing,[3] and other project losses. Southland filed additional claims with the contracting officer in April, 1985. Those claims were rejected on August 21, 1985. Southland filed an amended complaint on September 25, 1985 alleging further damages of $684,409.15.[4] In its post-trial brief, Southland claims total damages of $800,793.62.

## DISCUSSION

Following trial both parties attempted to settle. Trial counsel apparently worked out a tentative settlement on all issues. However, this settlement was not approved. Thus it is the court's duty to resolve the dispute. Trial counsel are, however, to be commended for their effective and efficient efforts.

## I. BURDEN OF PROOF

■ The government, in deducting from Southland's earnings, must carry the burden of proof to show that its actions were correct. *Martin J. Simko Constr., Inc. v. United States* 11 Cl.Ct. 257, (1986), *vacated in part*, 852 F.2d 540 (Fed.Cir.1988). "[T]he government has the burden of proving how much of a downward adjustment in price should be made ... the defendant has the laboring oar, and bears the risk of failure of proof, when a decrease is at issue." *Nager Elec. Co. v. United States*, 442 F.2d 936, 194 Ct.Cl. 835, 853 (1971).

■ Southland must prove all elements of the breach of contract in order to obtain an equitable adjustment. *Winn–Senter*

---

1. The definition of "unsatisfactory material" is covered under the Unified Soils Classification System. Generally, it is defined as soil, gravel, or sand which is *not of sufficient quality* (i.e., stability, drainage, etc.) to use in the construction of roads or embankments.

2. Only Change Order numbers 1 and 6 are at issue in this case. The contracting officer unilaterally issued Mod. #6, deducting $15,400 from the contract price for poor workmanship on the two bridge decks.

3. "Grubbing" is the clearing of stumps and roots. McGraw-Hill Dictionary of Scientific and Technical Terms 706 (2d ed. 1978).

4. Southland's additional claims included the government's liquidated damages penalty and further costs that Southland attributed to the Park Service's delay and project design defects.

*Constr. Co., v. United States,* 75 F.Supp. 255, 110 Ct.Cl. 34, 63 (1948). Southland must further show that it was harmed by the government's breach. *Id.*

## II. LIABILITY

There are two basic disputes over liability in this case. The first is whether the Park Service is responsible for the delays in completing the roadway and bridges. The second is whether there were latent defects in the Park Service's design of the project. In addition, there are various damages claims or factual disputes to which these claims of liability apply. In order to deal with these somewhat complex disputes efficiently, the court will first discuss the two general issues. After addressing defendant's evidentiary objections, the court will then discuss each item of damages.

### A. Delay Claim

Mod. # 1 covered only the direct costs associated with the design modification. It did not compensate Southland for any delays which were within the control of the Park Service. Southland did not waive any claims for losses associated with any such delays.

 Southland " 'bears the risk of both time and cost for delays which [it] causes or which are within [its] control.... The Government is responsible for both the time and cost effect of delays which it causes, which are under its control, or for which it has agreed to compensate the contractor.' " *Weaver–Bailey Contractors, Inc. v. United States,* 19 Cl.Ct. 474, 476 (quoting J. Cibinic & R. Nash, *Administration of Government Contracts* 409 (2d ed. 1986)), *recon. denied,* 20 Cl.Ct. 158 (1990). Moreover, a contractor is entitled to both an extension and recovery of excess costs associated with delay *only* if the delay was caused *solely* by the government. *See William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984).

 Contract item numbers 3 and 28 required Southland to remove a total of 1,000 c.y. of unsatisfactory material. In early December, 1982, the government realized there would be a large overrun in items 3 and 28 due to poor ground conditions. On December 14, 1982, the Park Service instructed Southland to delay undercutting the unsatisfactory material north of Highway 90. The Park Service warned Southland that any suitable material undercut would have to be replaced at Southland's expense. In March, 1983, the parties executed government initiated Mod. # 1, requiring Southland to use alternative means to provide a proper road bedding.

In order to compensate for the unstable ground conditions, Mod. # 1 required Southland to run filter fabric over the affected ground and then cover the fabric with crushed shell and sand. Southland removed the sand from a borrow pit.[5] Borrow pit sand is frequently wet and must be spread out and allowed to dry before it can be used. Southland intended to bring the sand to the job site in stages. That is, Southland wanted to bring a load of sand to one area of the site, spread it, disk and harrow[6] it, and then move to a different area to work on another load while the first was drying. In this way, Southland could use its equipment at full production.

Southland's plans were frustrated by the limited area of the site which was unaffected by the poor ground conditions and the Park Service's instructions to delay undercutting. At trial, the government contended that 65% (or about 4,000 feet) of the job site was available, while Southland claimed it could use only 35% (2,435 feet). However, in a response to plaintiff's interrogatory, the government stated that "Southland could have worked on the connector road and on the entrance road between approximate Stations 91 + 00 to 96 + 50 and between approximate Stations 100 + 20 to 114 + 00, or approximately 2,400 feet

---

**5.** A borrow pit is an excavation dug to provide material for fill elsewhere. MᴄGʀᴀᴡ-Hɪʟʟ Dɪᴄᴛɪᴏɴᴀʀʏ ᴏꜰ Sᴄɪᴇɴᴛɪꜰɪᴄ ᴀɴᴅ Tᴇᴄʜɴɪᴄᴀʟ Tᴇʀᴍꜱ 201 (2d ed. 1978).

**6.** A disk harrow and a harrow are instruments which are pulled over soil to break clods and level the surface. MᴄGʀᴀᴡ-Hɪʟʟ Dɪᴄᴛɪᴏɴᴀʀʏ ᴏꜰ Sᴄɪᴇɴᴛɪꜰɪᴄ ᴀɴᴅ Tᴇᴄʜɴɪᴄᴀʟ Tᴇʀᴍꜱ 726 (2d ed. 1978).

[out of 7,000 feet] of roadway."[7] This strongly supports plaintiff's contention.

There is ample support for finding that Southland's efficiency was impaired by the government's instructions to delay undercutting and the conditions leading to Mod. #1. Southland was unable to use its equipment at full production, further delaying completion of the project. Southland has neither been compensated for the costs of these delays nor has it waived its right to compensation. Accordingly, the court finds that the government is responsible for all the costs associated with the production delay.

### B. Design Defect Claim

■ Between November, 1982 and March, 1983, there was heavy rainfall on the job-site. The rainfall resulted in sloughing and erosion of the road bedding and the embankments for the bridges. The Park Service contended that the erosion was the result of Southland's failure to properly protect the slopes, as required by the contract. Southland countered that it had indeed used erosion control measures but that the design specifications of the embankments, the slope ratio, the type of materials used for the bedding and embankments, and the specifications of drainage pipes were the causes of the sloughing.

If there were design defects which caused the problem, the government is liable to Southland for its costs. The government implicitly warrants that its specifications, if followed, will result in acceptable performance. *Neal & Co. v. United States,* 19 Cl.Ct. 463 (1990) (quoting *J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 76–77 (1965)). The contractor must show that "notwithstanding substantial compliance with the Government's plans and specifications the result was defective." *Toombs & Co. v. United States,* 4 Cl.Ct. 535, 547 (1984) (citations omitted), *aff'd. without op. Toombs & Co. v. U.S.,* 770 F.2d 183 (Fed.Cir.1985). The burden then shifts to the government to show that defective workmanship or some other cause produced the unacceptable outcome. *Id.* at 548.

According to the government's daily reports, heavy rains in January, 1983, washed out certain culverts along with a substantial amount of embankment material. This caused massive erosion of the embankments and road bedding. Plaintiff's expert, John Campton, testified that the pipe designated by the contract was too small to handle the rainfall common to the Mississippi Gulf Coast area. This testimony was unrebutted.

In August, 1983, after heavy summer rains, a meltdown occurred at the job site.[8] Ronnie Blacklidge, Southland's president, testified that the embankments' erosion became uncontrollable. Plaintiff's expert, Louis J. Capozzoli, Ph.D., testified that the material required by the contract and the steepness of the slopes caused the erosion. The contract called for soil with a 10%/200 ratio (a fine sand).[9] Dr. Capozzoli stated that such material is coarse enough to absorb water but will not allow water to pass through. The resulting water build-up causes erosion. Moreover, Dr. Capozzoli testified that a slope ratio of 1.5 to 1.0 is unusually steep and particularly prone to erosion.

Dr. Capozzoli's testimony is corroborated by a memo from the project supervisor to the designer dated November 18, 1982. The memo stated that the 10%/200 soil requirement "effectively eliminated" otherwise acceptable soils. Further, the other

---

7. Government's Answer to Plaintiff's Interrogatory, No. 28. The government argues that this response was limited to available work areas on December 16, 1982. By December 16, 1982, the Park Service's instructions to delay undercutting were already in effect. These instructions and the unstable ground conditions continued to limit the available work area until Mod. #1 was executed in March.

8. A meltdown occurs when the material is coarse enough to allow water to seep in at the top but not coarse enough to let the water drain out the bottom. When the water finally builds enough pressure it escapes carrying the finer material with it. Overlying material collapses into the voids left by the finer material.

9. "10%/200" refers to the percentage of soil which is able to pass through a 200 grade sieve.

classes of soil allowed in the specifications were not suitable for high, steep embankments. Southland had requested that it be permitted to use 20%/200 material, but the government refused. Thus, not only did the government's design produce the problem, but the plaintiff's request to allow a correction was rejected. As a result, Southland had to replace the material and rebuild the embankments.

The government argued that the erosion and meltdown were caused by Southland's failure to implement contractually required erosion controls. Southland used various techniques to control the erosion and sloughing, such as planting rapid growing grasses, placing straw mulch, digging ditch checks [10] and placing hay bales to catch the water running down the embankment. The government's post-contract attempts to repair the site further demonstrate that Southland was not responsible for the erosion.

On October 6, 1987, almost three years after the Park Service issued Southland's certificate of substantial completion, the government issued a *new* request for bids for correction of embankment erosion. The contractor was to place clay fill and sod to direct the flow of water away from the embankment edge. Two years later, after this follow-on contract, the problem *still* existed! At the end of trial, when the court visited the job-site, gullies as deep as five feet were visible. Thus, even after Southland's and the post-construction contractor's attempts to control erosion, the site remained seriously flawed. It is absolutely clear that erosion controls, or lack thereof, were not the problem. Serious defects in the design caused the continuing erosion of the embankment.

The evidence offered by the government to fault Southland's erosion control efforts does little to rebut that conclusion. Russ Virgin, a landscape architect with the Park Service who served as job inspector on the project, testified that Southland provided little erosion control. However, Mr. Virgin admitted that he had very little experience with road construction. Additionally, the government did not credibly rebut Dr. Capozzoli's testimony indicating that design defects caused the loss of material. In fact, Edward Boggs, a Park Service Construction Section Chief, testified that he would have been more conservative *"than probably the idiot who designed it."* [11]

## III. ADMISSIBILITY

In its post-trial brief, the government makes several objections to the admissibility of evidence and testimony at trial. The court overrules these objections as they were not timely made at trial. However, had the objections been made properly, there exists adequate legal basis for the court's decisions.

### A. Site Visit

■ Near the end of trial, the court visited the job site with both parties' attorneys and the clients' representatives. At the trial's conclusion, the court stated that "the most significant evidence" was the site itself. However, the court did not state that its viewing was the only basis for its decisions. The government now contends that the court's visit to the site was improper.

There is a dearth of case law on the subject of judicial site visits. It is well established, however, that such action is entirely appropriate. 4 Wigmore, *Evidence* § 1169 (Chadbourn rev. 1972); *Snyder v. Massachusetts*, 291 U.S. 97, 111, 54 S.Ct. 330, 334, 78 L.Ed. 674 (1933). Judges may even make site visits without the parties themselves present, provided the visit is not evidentiary. *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 420–21 (6th Cir.), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). What is less clear is how the site visit is to be used by the judge and what procedures he must follow to guard against improper viewing.

**10.** A ditch check is a ditch strategically placed to catch the eroding material and water to prevent its disbursement over a wide area.

**11.** Mr. Boggs made this statement at his deposition and subsequently affirmed it at trial. Record at 1166.

Site visits taken in order to familiarize the fact-finder with the object of the lawsuit are acceptable. *E.E.O.C. v. Mercy Hosp. & Med. Center,* 709 F.2d 1195, 1200 (7th Cir.1983). It is unclear whether a viewing constitutes evidence. Viewings which are evidentiary in nature are, however, arguably permissible. McCormick, *Evidence* § 216 (1972); 76 Am.Jur.2d § 1247 (1975). As a general rule, the court may not base its decision on observation alone. 76 Am.Jur.2d § 1247 (1975) (citations omitted). It is likely that evidentiary viewings require procedural safeguards. *Price Bros. Co.,* 649 F.2d at 419.

In the instant case, the government helped arrange the site visit. Both parties were present at the viewing; either party could have imposed limitations on its purpose or scope. The court finds that its viewing of the job-site was permissible and, in the alternative, the viewing would be harmless error as it was not the sole factor in the court's decision. *In re State Highway,* 129 Neb. 822, 263 N.W. 148 (1935). Moreover, the job-site was in the control of the government, which permitted the government "to present an image favorable to [itself]." *United States v. Professional Air Traffic Controllers Org.,* 527 F.Supp. 1344 (N.D.Ill.1981); *accord United States v. Washington,* 459 F.Supp. 1020, 1095–97 (W.D.Wash.1978). Merely permitting inadmissible evidence is not in itself reversible error. *McDonald v. United States,* 205 Ct.Cl. 780, 786 (1974) (citing *Field v. United States,* 34 U.S. (9 Peters) 182, 202, 9 L.Ed. 94 (1834)), *later app. McDonald v. United States,* 531 F.2d 490, 209 Ct.Cl. 62 (1976).

### B. Prior Statements of Witnesses

The plaintiff and the government object to, or seek clarification of, the court's rulings on several objections raised regarding the prior statements of witnesses.

At trial, the government asked Mr. Virgin about Southland's maintenance of the job-site slope. Plaintiff's counsel objected under Rule 613(b), claiming that Mr. Virgin was about to testify in a manner which would indirectly attack prior witness Fred Hoth and his credibility. The court reserved judgment on this objection at trial and now rules this testimony permissible. Mr. Hoth did not testify to the maintenance of the slope, but rather to the preparation of the slope for soil and bedding. As Mr. Virgin's testimony went directly to slope maintenance, no problems of inconsistency present themselves.

The government objects to the court's ruling on Southland's Rule 613(b) objection concerning the testimony of Roger Mackey, a project engineer for the Army Corps of Engineers (Corps). Government counsel questioned Mr. Mackey about his observations at the job-site and any discussions that he may have had with Southland's site manager, Ward Buel. After a sidebar, the court instructed government's counsel not to ask questions which would provide answers inconsistent with Mr. Buel's testimony. The government acquiesced to the court's ruling at the bench. The court finds no basis for the government's current objection.

At trial, Mr. Mackey testified that Mr. Blacklidge told him the job would not have been completed had Mr. Blacklidge not fired Mr. Buel. The government now argues that Mr. Mackey could testify to Mr. Blacklidge's statement as an admission by a party opponent under Rule 801(d)(2). However, upon plaintiff's objection at trial, government counsel stated that its witness had gone "beyond the scope of the question" asked. Government counsel did not press the court for a ruling on Southland's objection, and instead continued on with direct examination of Mr. Mackey. Again, the court finds no basis for the government's new objection.

The government also argues that Mr. Jacobs could give his opinion of a report prepared by Dr. Capozzoli. However, when plaintiff objected to this testimony at trial, government counsel agreed not to ask any further questions on the report. Counsel did not make an offer of proof at the time to show how the testimony would be admissible, nor did he take exception to the court's sustaining the objection. The

government has waived its right to object to this ruling.

## C. Subsequent Remedial Measures

■ Southland presented evidence that, due to severe erosion, the Park Service redesigned the road well after Southland completed construction. The government claims that such testimony is barred under Rule 407 which provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Rule 407 is commonly applied in tort suits to exclude evidence of post-injury modifications in product design. "One of the general policies behind Rule 407 is that it encourages desirable repairs by assuring defendants that precautions taken after a mishap are not to be admissible against them as evidence of their past negligence." *Rimkus v. Northwest Colorado Ski Corp.,* 706 F.2d 1060, 1064 (10th Cir.1983). Rule 407, however, expressly allows the evidence introduced by Southland and further, such evidence does not contravene the policies behind the rule.

Rule 407 does not bar testimony on remedial measures to show the feasibility of precautionary measures, if contested. *Bauman v. Volkswagenwerk Aktiengesellschaft,* 621 F.2d 230, 233 (6th Cir.1983) (trial court erred in admitting evidence of design change where feasibility was not contested). In the instant case, the design of the road was at issue and the parties contested the feasibility of precautionary measures concerning the road. The court finds that Southland's evidence on the subsequent redesign of the road was admissible.

## D. Expert Testimony

■ Finally, the government contends that the court should not be persuaded by the plaintiff's expert witnesses. It makes a great deal out of the fact that Southland's experts never visited the site during construction. However, expert testimony need not be based on personal direct observation alone. Fed.R.Evid. 703, notes of advisory committee. The weight of that testimony is to be determined by the judge. *Pittman v. Gilmore,* 556 F.2d 1259 (5th Cir.1977); *cf. Baskett v. United States,* 8 Cl.Ct. 201, 225 (1985), *aff'd. without op.,* 790 F.2d 93 (Fed.Cir.), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986). The court acknowledges that Southland's experts' testimony was not flawless. However, the court has never heard an expert whose testimony was flawless. Southland's expert testimony was, however, highly credible and certainly sufficient to meet the plaintiff's required burden of proof in those areas where Southland prevailed. Many factors go to the weight to be given an expert's testimony. Whether in a construction case they visited the site is only one of many such factors. It is ironic that the government here criticizes the plaintiff's experts for *not* doing what the court is criticized *for* doing.

## IV. ITEMS OF DAMAGES

Assuming government fault, the parties dispute the damages on Southland's claims for delay, design defect, clearing and grubbing, and asphalt and pilings. The government, while not conceding fault, agrees with plaintiff's figures for river sand, survey stakes, topsoil, the new Highway 90 entrance, savings on the stripping of topsoil, shrinkage, overfill, clearing and grubbing pay limits, seeding, the bridge finish, liquidated damages, and extended overhead. The court will first address the disputed damages claims.

## A. Disputed Claims

The government contends that Southland has incorrectly calculated the equipment ownership cost portion of plaintiff's delay,

design defect, clearing and grubbing, and asphalt and pilings claims. The parties agree that Southland's actual costs are difficult to determine and should, therefore, be calculated with reference to an equipment rate schedule. Southland's expert, William Powell, calculated Southland's costs using the 1982 Rental Rate Blue Book as a guide.[12] The government's expert, John Edenfield, contends that the 1966 AGC Manual should be used. The court cannot say that one rate schedule is inherently superior but finds that the Blue Book is the appropriate starting point in the instant case. Mr. Powell's calculations are based on the equipment prices the parties agreed upon for Mod. # 1. The court will not adopt the government's equipment rate calculations as they vary significantly from the prices which the contracting officer had previously agreed were reasonable.

### 1. Delay

Southland claims $100,866.90 for its loss of productivity associated with the government's delay of the project. This amount reflects a 55.7% inefficiency level between the government's December, 1982, instructions to delay undercutting and the March, 1983, issuance of Mod. # 1, or $95,366.90. The additional $5,500.00 is Southland's claim for extra-mobilization of its pile-driving subcontractor.

The government argues that, if Southland was inefficient, Southland's inefficiency level was only 51.9%, or $61,470.00. However, plaintiff is not required to prove its damages with mathematical precision. Instead, Southland need only provide sufficient evidence to enable the court to make a fair and reasonable approximation. *CCM Corp. v. United States*, 20 Cl.Ct. 649, 656–57 (1990). Southland's cost expert, Mr. Powell, presented credible and reliable testimony on Southland's loss of productivity. The court adopts Mr. Powell's calculation of $95,366.90 for Southland's delay claim. However, Southland failed to submit a claim to the contracting officer for the extra-mobilization of its piling subcontrac-

tor. Therefore, the court has no jurisdiction over Southland's claim for an additional $5,500.

### 2. Design Defect

Southland claims $252,729.43 in costs resulting from the government's defective design of the project. The government argues that Southland is entitled to $65,-696.00 on this claim. The parties dispute the equipment rate and number of days charged to erosion control efforts. As discussed above, the court accepts Southland's equipment rate calculations. However, it remains the court's task to determine the amount of time Southland actually spent combatting erosion.

Mr. Powell presented a comprehensive study of Southland's costs attributable to erosion repair work. Based upon Southland's certified payrolls, Mr. Powell calculated the labor from April 19, 1983 to September 17, 1984. Mr. Powell testified that he also consulted Mr. Blacklidge in determining the number of days Southland devoted to erosion control.

The government challenges Mr. Powell's calculations because they are not based on first-hand information. Mr. Virgin, the government's job inspector, testified that his calculations were based on daily job-site observations. However, Mr. Virgin's testimony was not credible. Mr. Virgin testified that Southland's failure to implement erosion controls was the sole cause of the erosion and, further, that nothing could change that opinion. As discussed above, the court has found that Southland properly responded to the erosion which clearly resulted from a defective design. Mr. Virgin's insistence on blaming Southland and his admitted lack of road construction experience suggest that Mr. Virgin's testimony is based more on opinion than observation.

The court finds that Southland has met its burden of proving the costs associated with job-site erosion. The government has failed to credibly rebut this evidence. Accordingly, Southland is entitled to recover $252,729.43 on its defective design claim.

---

12. Mr. Powell testified that the Blue Book rates were merely used as a guide, with downward adjustments where equitable. Thus, in many instances the equipment rates charged were actually lower than Blue Book listing. Mr. Powell was a highly credible and effective expert.

Southland also seeks to recover the Park Service's deductions for material loss. In November, 1983, the Park Service deducted $31,044.25 because 6,928 c.y. of material had eroded. The Park Service subsequently deducted an additional $17,318.25 for 4,075 c.y. of material lost during the summer meltdown. The government's deductions for material lost as a result of its defective design were clearly improper. The court finds Southland is entitled to recover the amounts deducted by the Park Service for lost material.

### 3. Clearing and Grubbing

Between the L & N Railroad tracks and the new Highway 90 were a series of ponds. Southland and the government became aware of the high ground water level in that area in December, 1982. The marshiness of the buttercup area made use of heavy construction equipment all but impossible. Even the government's expert witness, James Ellis, testified that the ground became "liquid" under the weight of heavy machinery, and he stated that the make-up of the ground did not permit use of standard equipment and procedures. Consequently, the Park Service issued Mod. #1, requiring the fabric and clam shell as a new approach to this unanticipated ground condition.

Section 01010–2 of the contract ordered Southland to "protect all vegetation and marsh areas within and adjacent to the work. Intrusion into the marsh areas shall be restricted to that specifically required for construction activities." Due to the high ground water levels which interfered with construction, Southland sought permission to temporarily drain the ponds in order to complete work on the roadway adjacent to the buttercup area. However, the Park Service denied permission to drain the ponds, forcing Southland to use a more expensive method to clear and grub the area. The Park Service subsequently refused to pay for the more difficult clearing and grubbing. The court finds that this denial was contrary to Southland's contractual rights. Southland is entitled to recover $21,154.14 for the clearing and grubbing made more difficult by the unstable ground and defendant's refusal to allow Southland to drain the ponds.

### 4. Asphalt and Pilings

When the road bedding or subgrade[13] was sufficiently compacted, Southland laid down sealant to maintain compaction and moisture. Southland then spread asphalt over the treated sub-grade and rolled it. While driving on the subgrade, Southland's trucks locked their brakes and created ruts in a few areas. The asphalt conformed with the sub-grade, leaving thick and thin areas in the paving. This unevenness was unacceptable. Southland contended that the rutting was the result of the unacceptable material used in the sub-grade. However, Mr. Blacklidge admitted that he had seen his trucks lock their brakes at least once and that this may have caused the rutting. Mr. Virgin also saw a truck locking its brakes.

The court finds that Southland was responsible for the rutting in the asphalt. Therefore, Southland's claim for $7,397.00 is denied.

Southland and its subcontractor, W.R. Fairchild, Co., were required to drive three kinds of piles[14]: test piles, used to determine the depth of the hard pan stratum upon which future pilings would rest; piles driven below existing grade clusters, to be used for pier footings for bridge abutments; and abutment piles, which were driven after completion of the bridge approach embankment. Southland's test piles determined that the hard pan was approximately 40 feet below the surface. Therefore, it intended to use 40 foot piles for the embankment. However, when the later piles were driven, they broke through the first pan, stopping at various lower strata up to a depth of 50 feet. The contract required Southland to continue piling until the piles were set. When set below

---

13. The subgrade is the soil or rock leveled off to support the foundation of a structure, in this case the road. McGraw-Hill Dictionary of Scientific and Technical Terms 1558 (2d ed. 1978).

14. A pile is a post made of timber, steel or concrete which is placed vertically in the ground. McGraw-Hill Dictionary of Scientific and Technical Terms 1215 (2d ed. 1978).

40 feet, Southland had to splice the piles.[15] In order to splice the piles, Southland had to dig a pit around the pile and put its workers in the hole. Southland had to shore the sides of the pits to keep them from collapsing on the workers.

Southland claims $13,085.00 for shoring costs. However, Southland was required by the contract to comply with occupational, safety and health standards relating to construction. These standards require that excavations over five feet deep be sufficiently shored to create a safe slope. The court, therefore, finds that the shoring was mandated for safety reasons, and is not compensable above the original contract price. Southland's $13,085.00 piling claim is denied.

### B. Undisputed Claims

The government and Southland have agreed to dollar amounts on the following claims, assuming government liability. The remaining issues involve contract interpretation. In interpreting contracts, the court must adhere to the intent of the parties if it can be determined. *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986). If there is ambiguity, a two-step analysis must be applied. "First, the court must ask whether the ambiguity was patent. This is not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum: Is it so glaring as to raise a duty to inquire?" *Newsom v. United States*, 676 F.2d 647, 230 Ct.Cl. 301, 304 (1982). If the ambiguity is not patent, the second step is to determine whether the plaintiff's interpretation of the contract was reasonable. *Id.;* see also *Mountain Home Contractors v. United States*, 425 F.2d 1260, 192 Ct.Cl. 16, 21 (1970). If the interpretation was reasonable, the rule of *contra proferentum* applies and the contract is construed against the party who drafted the instrument, in this case the United States. *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir. 1987).

### 1. River Sand

Mod. #1 required Southland to provide river sand in place of specified embankment material. The contracting officer established a minimum height of two feet above high water level. The government contends that the contract permitted one tenth of a foot tolerance; Southland could provide from 1.9 to 2.1 feet of embankment. Southland argued that a minimum of two feet with a 0.1 foot tolerance meant a median of 2.1 feet with tolerances of 2.0 and 2.2 feet. The government denied payment in the amount of $4,672.36 for the sand over 2.1 feet.

Using the analysis noted above, the court finds a latent ambiguity in the contract. Thus, the court must look at the reasonableness of the contractor's interpretation of the ambiguity. Southland reasonably assumed that a 2.0 foot minimum with a 0.1 foot tolerance meant a 2.1 foot median. As Southland's interpretation was reasonable, the contract must be construed against the government under the rule of *contra proferentum*. Thus, Southland prevails on its claim for $4,672.36.

### 2. Survey Stakes

The parties dispute whether the contract required the government to set construction stakes around the job-site. Southland did not believe that it was required to do so. It did not, therefore, include the cost of setting stakes within its bid. Mr. Powell testified that a reasonable contractor reading the contract would conclude that the government was responsible for the stakes. As for the government's project inspectors, Mr. Virgin provided some testimony indicating that the setting of stakes was Southland's responsibility. Mr. Mackey was uncertain as to the division of duties.

Section 01050, Part 1: General, 1–1 A of the contract states:

Contracting Officer will set initial construction stakes establishing lines, slopes, and grades for road work, and reference and base lines and bench

---

**15.** "Splicing" is simply the connecting of two parts to form one continuous length.

marks for bridges and accessory structures.

\* \* \* \* \* \*

Contractor shall ... perform all additional staking he deems necessary to execute the work.

The term "construction stakes" is not defined in the contract and may be considered ambiguous, though not patently so. Mr. Powell testified that the term meant both "control stakes" and "construction stakes".[16] The government set the control stakes, but not the construction stakes. Southland is entitled to recover for the cost of setting the construction stakes as the ambiguity must be construed in its favor. The court finds Southland is entitled to recover $24,226.00 on its survey stakes claim.

### 3. Topsoil

The contract required Southland to place 3 inches of topsoil on the imported embankment material. Southland did so, and now claims $11,965.00 for the placement of topsoil. Initially, the project manual provided that the contractor would be paid for embankment material after it had been measured in field cross sections.[17] Southland argues that the cross sections would have necessarily included the topsoil as the cross sections would be taken from the finished embankment. Defendant argues that topsoil would not have been included in the cross section measurement, because the measurement would have been taken prior to the placing of the topsoil. The government also contends that, regardless of the cross section question, the contract provided that no separate measurement or payment was to be made for the topsoil. Southland asserts that the contract was construed by both parties as requiring payment for topsoil.

The parties initially agreed that Southland was to be paid for topsoil. Fred Spencer, a representative of the contract-ing officer, submitted pay estimates for some of the topsoil. The government paid Southland for this portion of the topsoil without complaint. Only later did the government rely on the contract clause forbidding separate measurement and payment for topsoil. The government's argument that the topsoil payment clause was unambiguous is undercut by the fact that the government did not consistently interpret the clause. While defendant's current interpretation of the clause may be reasonable, Southland's understanding that it was to be paid for topsoil is quite reasonable in light of the government's actions and the contract's language. It is the court's view that the topsoil measurement and payment clause was ambiguous. As contractual ambiguities are construed against the drafter, the court finds that Southland is entitled to its $11,965.00 claim for topsoil.

### 4. Highway 90 Entrance Material

The entrance to Highway 90, on the northern end of the project, bordered the buttercup area. Southland asserts that the ground water from the area rendered the surrounding ground material unsuitable, necessitating its excavation. Southland further asserts that defendant refused to pay Southland for the removal of this material. The government argues that the material was suitable and that Southland was, in fact, properly paid.

Defendant asserts that the excavated material was dried and used to repair erosion damage, thereby becoming suitable. Defendant claims that because the material became suitable, Southland was not entitled to payment under the contract clause providing payment for the removal of unsuitable material. Instead, the government claims that Southland already received payment for the suitable material by loose volume measurement of the embankment. The government's argument is, as the late Chief Judge Marvin Jones once said "[s]in-

---

**16.** Control stakes are those required to lay out the job (e.g., center line stakes and benchmarks). Construction stakes are set according to the control stakes. They establish the elevations for grades and subgrades.

**17.** Addendum #2 to the project manual ultimately changed the payment measurement procedure from taking cross sections to a payment based on loose truck measurements minus a shrinkage factor. However, the required quantity of topsoil remained the same.

gularly free from any suspicion of logic." *Belcher v. United States*, 94 Ct.Cl. 137, 140 (1941). At issue is not the origin or future use of the material, but rather the work involved in removing it. The government's argument overlooks the fact that the material only became suitable after it was removed by Southland and dried. The court finds Southland is entitled to $7,840.00 for the removal of unsuitable Highway 90 entrance material.

### 5. Savings on Stripping of Topsoil

As stated above, Mod. # 1 required that Southland lay filter fabric over the unsuitable ground material. The fabric made stripping of topsoil optional and this was left to the discretion of the contracting officer. Southland did not remove the topsoil. Consequently, the government deducted $15,549.72 for Southland's savings on the stripping.

Southland argues that it did not have to remove the topsoil. Nevertheless, it maintains that it should be paid since the government made its deduction long after the Mod. # 1 negotiations were closed. Further, it claims that the government's figure for deduction is incorrect and not reflective of accurate costs for stripping.

The court finds Southland's claims without merit. Whether the change order was closed is irrelevant as it stated that unless otherwise modified, "all work shall be performed in accordance with the provisions of the contract...." There was no language, express or implied in Mod. # 1, relieving Southland of its obligation to strip the topsoil. Since the work was not performed, the government was entitled to make a deduction.

The government proved that the amount of its deduction was fair and reasonable. Mr. Mackey used the 1983 *Means Estimating Guide* to establish a $775 per acre rate. Southland failed to present any evidence that the *Means Estimating Guide* was an inadequate index. Rather, Southland emphasizes that the $775 rate was merely an estimate. An exact calculation of costs is neither required by the court nor possible in this case. However, the government has shown that its deduction was fair and rea-

sonable. The court finds that the government's deduction of $15,549.72 for Southland's savings on the topsoil was appropriate.

### 6. Shrinkage

At the conclusion of the project, the Park Service deducted $66,550.30 by applying an 18.1% shrinkage factor to the imported embankment material, instead of the 10% rate used throughout construction. At trial, however, the government stipulated that the shrinkage factor of 10% was reasonable according to the specifications. The court finds that the stipulated shrinkage rate of 10% is appropriate. Accordingly, Southland may recover the $66,550.30 deducted by the Park Service.

### 7. Overfill

The Park Service deducted $56,606.27 from payment, claiming that Southland was overpaid for embankment material. The government has the burden to prove the reasonableness of its deduction. *Nager Elec. Co.*, 194 Ct.Cl. at 853. The government failed to prove that Southland had, in fact, overfilled the embankment. During construction, each load of embankment material brought to the site was approved by government representatives. Payment for the material was calculated by loose truck measurements with a 10% shrinkage factor. However, the deduction was based on cross section measurements. The government has not justified the change in measurement methods nor has it established the exact amount of the alleged overfill. The government's expert witness, Mr. Jacobs, was unable to testify to the amount of alleged overfill at the job-site. The government clearly has not met its burden of proof on the overfill. Thus, Southland is entitled to the $56,606.27 deducted for overfill.

### 8. Clearing and Grubbing Pay Limits

Southland cleared and grubbed area beyond the toe of the slope (a total of 18.467 acres) at a cost to the Park Service of $18,669.00. The government claims that the toe of the slope was the clearing and grubbing limit. However, the government admits that it allowed Southland to clear

beyond the toe of the slope to give Southland greater access to the site. Although the government claims that it was not required to do so by the contract, its actions certainly implied that a reasonable interpretation of the contract was that the toe was not the clearing and grubbing limit. Southland's witness, John Campton testified about the areas cleared and the necessity of Southland's exceeding the toe limit. Simple geometry and logic also imply this. The contracting officer, Robert Laubenheim, testified that the plaintiff's calculation of payment was correct. The area and price being reasonable, the court finds that plaintiff prevails on its $18,669.00 clearing and grubbing claim.

### 9. Seeding

Southland was required to reseed any areas cleared which remained exposed. The requirement included areas outside the toe limit as well as within. Mr. Campton testified that Southland reseeded 11.695 acres at a cost of $13,542.00. As the court has found the clearing of this area was reasonable, it finds the reseeding was required.

### 10. Bridge Finish Deduction

Upon completion of the first bridge, over Old highway 90, the government discovered that the bridge was nonconforming. The deck of the bridge contained numerous depressions. The government allowed Southland to repair the nonconforming deck. The uncontroverted estimate is that Southland's method of repair has a lifespan of approximately seven years. The bridge's estimated lifespan is 50 years, necessitating seven repairs over the life of the bridge. In accordance with the contract, the government accepted the repairs at a reduction in price.

After Southland had completed the bridge over the L & N tracks, the government discovered the same nonconforming problems. The same repairs were required for the second bridge. Since the bridges will require future repairs, the government is entitled to the $15,400.00 deduction it made.

### 11. Liquidated Damages

The Park Service assessed Southland with $37,250.00 in liquidated damages. This deduction was based on the contract rate of $250.00 per day and was charged for the 149 days following the May 1, 1984 completion date. The court has found that this delay was caused by the government's instructions to cease undercutting, the ground conditions leading to Mod. # 1, and the government's limitations on the job site. Southland should not be penalized for delays caused solely by the Park Service. Southland may recover the $37,250.00 assessed as liquidated damages.

### 12. Extended Overhead

The parties stipulated that Southland experienced additional costs completing the contract for home office overhead in the form of insurance, management, engineering, bonding, funding, computer use, and supply acquisition. The Park Service, however, asserts that it is entitled to a credit for overhead included in certain unit price items.

Under the formula established in *Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA ¶ 2688 (1960), *aff'd. on recon.*, 61–1 BCA ¶ 2894, reimbursement for "extended" contractor costs is computed according to the following formula:

CONTRACT BILLINGS

$$\frac{\text{Total billings for}}{\text{contract period}} \times \frac{\text{total overhead}}{\text{for contract}} = \frac{\text{overhead}}{\text{allocable}}$$
$$\text{period} \qquad \text{to contract}$$

$$\frac{\text{ALLOCABLE OVERHEAD}}{\text{days of performance}} = \text{daily contract overhead}$$

$$\text{Daily contract overhead} \times \text{days delay} = \text{amount recovered}$$

*Capital Elec. Co. v. United States,* 729 F.2d 743, 747 (Fed.Cir.1984).

The contracting officer, Mr. Laubenheim, used this formula and arrived at $84,-928.00. This figure represents a 239 day delay period at $355.35 per day but excludes some $29,700.00 already claimed by Southland in unit price items.

The court finds that this figure accurately represents Southland's recoverable overhead. Southland's unit price items claim would essentially result in double payment if allowed as extended overhead. Accordingly, Southland may recover $84,928.00.

## CONCLUSION

Plaintiff presented evidence of damages resulting from the change order and the defective design totalling $743,861.90. The amount is broken down as follows:

| | |
|---|---|
| Delay | $95,366.90 |
| Defective Design | 252,729.43 |
| 6,928 c.y. deduction | 31,044.25 |
| 4,075 c.y. deduction | 17,318.25 |
| Clearing and grubbing | 21,154.14 |
| River sand | 4,672.36 |
| Survey stakes | 24,226.00 |
| Topsoil | 11,965.00 |
| Highway 90 entrance | 7,840.00 |
| Shrinkage | 66,550.30 |
| Overfill | 56,606.27 |
| Clearing and grubbing pay limits | 18,669.00 |
| Seeding | 13,542.00 |
| Liquidated damages | 37,250.00 |
| Extended overhead | 84,928.00 |
| | $743,861.90 |

The government has presented evidence showing justification for deducting payment on certain items. Specifically, the government has shown that it was correct in deducting for the following: (i) savings on stripping, $15,549.72; and (ii) bridge finishing, $15,400.00. The government fur-

ther showed that Southland was not entitled to its claims for asphalt and pilings.

Plaintiff litigated this case with great skill and efficiency. It is clear to the court that defendant's position on the overwhelming amount of issues was not substantially justified. It was also clear that the amount of litigating time at trial devoted to those areas where defendant prevailed was no greater than the pro rata share of those items of the total amount at issue. In fact, the time devoted to those items appeared to the court proportionately less. During the post-trial preliminary settlement both counsel agreed to a very clear and equitable settlement on this issue. It was achieved in the best traditions of the bar working cooperatively together. However, since it was not approved, the court finds that a highly fair and reasonable number in this case would be for plaintiff to receive 95% of its total expended fees under the EAJA limitations.[18]

Plaintiff has met its burden of proving its entitlement to an equitable adjustment in the amount of $743,854.43 with interest under the Contract Disputes Act, 41 U.S.C. § 611, running from November 26, 1984, the date the initial claim was filed with the contracting officer. The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

**18.** This percentage is rounded up from Southland's $743,854.43 recovery divided by its $800,-

793.62 total claim.